PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DARRELL WALTER HOLMES,

*Defendant-Appellant.*

No. 10-4738

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Mark S. Davis, District Judge.
(4:09-cr-00085-MSD-FBS-1)

Argued: December 8, 2011

Decided: February 29, 2012

Before TRAXLER, Chief Judge, and AGEE and DIAZ,
Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opin-
ion, in which Chief Judge Traxler and Judge Diaz concurred.

**COUNSEL**

**ARGUED:** William Francis O'Mara, Jr., SACKS & SACKS, Norfolk, Virginia, for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Andrew Michael Sacks, SACKS & SACKS, Norfolk, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Lisa R. McKeel, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

---

**OPINION**

AGEE, Circuit Judge:

Darrell Walter Holmes appeals his conviction in the District Court for the Eastern District of Virginia for two counts of aggravated sexual abuse of a child, in violation of 18 U.S.C. §§ 7 and 2241(c). Holmes challenges the district court's pre-trial decisions denying his motions to dismiss the indictment due to lack of venue and jurisdiction, denying his motion to suppress statements he made to military investigators, and granting the Government's motion in limine to exclude an expert witness. *See United States v. Holmes*, 699 F. Supp. 2d 818 (E.D. Va. 2010) (Case No. 4:09cr85). Finding no error, we affirm the judgment of the district court.

I.

The conduct underlying Holmes' conviction occurred while he was on active duty with the United States Air Force and stationed at Yokota Air Base in Japan. On two separate occasions "in or about" 1999 and 2002, Holmes forced his stepdaughter ("T.B.") to perform oral sex on him. At the time of both acts, T.B. was under the age of nine.

Holmes and T.B.'s mother ("J.H.") were married at the time of the acts of sexual abuse, but divorced in June 2003. Shortly after the divorce, T.B. told J.H. what Holmes had done to her. J.H. confronted Holmes via telephone about the accusations, but the matter was not pursued by J.H. at that time because T.B. recanted her statements.

From January to May 2007, Holmes was deployed to Qatar, working 12-16 hour days six days a week. While Holmes was in Qatar, T.B. renewed her accusations against him and this time J.H. reported the incident to the Air Force, leading to an inquiry by the Air Force Office of Special Investigations ("OSI"). Holmes' return from his duty post in Qatar was a multi-stop journey that took approximately 77 hours before he arrived in Norfolk, Virginia around 11:30 p.m. on May 20th. Upon Holmes' return to Langley Air Force Base mid-day on the 21st, Holmes' commanding officer instructed him to report to OSI for questioning.

OSI Agents Keith King and David Chan conducted the interview, which lasted approximately two hours. Prior to questioning, Holmes was informed of T.B.'s allegations and given his rights under the Fifth Amendment of the United States Constitution and Article 31 of the Uniform Code of Military Justice. Holmes initialed and signed an acknowledgement and waiver of those rights. Agent King inquired as to Holmes' mental and physical state, and Holmes replied that he "felt fine," "was good," and was "[h]appy to be home." (J.A. 302-04.) When Holmes was asked about the accusations, he repeatedly stated he did not "think [he] could do something like that," although Agent King noted the fact that Holmes never directly denied it. (J.A. 313.)

During the OSI interview, Holmes discussed with the agents, inter alia, his marriage to J.H., their estrangement during the time of the accused conduct, T.B.'s prior statements against him and her subsequent recantation, and what might have led T.B. to make and renew these allegations. Through-

out the interview, Holmes did not get angry, but remained "very calm" and "level-headed." (J.A. 314.) He also "seemed alert" and "was responsive to the questions," such that Agent King did not observe any indication that he was sleepy or otherwise physically unable to continue. (J.A. 312.) At some point in the interview, Agent King told Holmes that "if [they] were able to find out the truth behind the allegation[s], . . . [they] could settle this, [and] there's a possibility that [Holmes] could spare [T.B.] from having to testify. Getting up on the stand would obviously be stressful for a child to have to deal with . . . ." (J.A. 332.) When Holmes expressed concern about his career, Agent King explained that he "couldn't tell [Holmes] what would happen to his career" and that he had "seen people be charged with things and still maintain their career." (J.A. 352-53.) However, Agent King did not recall indicating that an individual who had been "accused of molesting a child" had kept his career. (J.A. 353.)

Eventually, Holmes admitted that he "had molested his step-daughter." (J.A. 315.) Agent King asked Holmes to "talk [him] through what had happened," and Holmes described that his marital problems had led to drinking alcohol and watching "a lot of pornography." (J.A. 315.) Holmes stated that on numerous occasions when J.H. was attending night school, he had taken care of T.B. And he confessed that on two such evenings he had "brought [T.B.] into their room, and . . . had her perform oral sex on him, orgasming into her mouth." (J.A. 315.)

Holmes agreed to make a written statement as well, in which he described "the gravest mistake of [his] life" and provided the same account of what had happened. (J.A. 451.) Agent King asked three follow-up questions, which Holmes answered, initialing his responses. Specifically, Holmes admitted to "orgasm[ing] into [his] step daughter's mouth and hav[ing] her spit the semen into the bedroom toilet," stated that the second incident occurred for the same reasons as the first time ("drinking and watching pornography"), and denied

ever having sexual relations with another child or with his step-daughter after the second incident. (J.A. 451-52.)

This case came before the district court following lengthy procedural delays. In July 2007, the Air Force ordered a general court-marital of Holmes under the Uniform Code of Military Justice, but that proceeding was subsequently dismissed without prejudice in March 2008. The following month, a grand jury in the Eastern District of Virginia indicted Holmes on two counts of aggravated sexual abuse of a minor, in violation of 18 U.S.C. §§ 7 and 2241(c) ("first indictment"). Holmes was arrested in the Eastern District of Virginia, but the first indictment was subsequently dismissed without prejudice, although the order does not provide a reason for that action.[1]

In October 2008, Holmes was discharged from the Air Force and returned to Chicago, Illinois, where he had maintained his permanent residence throughout his military service. The following month Holmes was re-indicted in the Eastern District of Virginia, upon the same two counts of aggravated sexual abuse of a minor, in violation of 18 U.S.C. §§ 7 and 2241(c) ("second indictment"). Holmes was arrested in North Carolina and then transported to the Eastern District of Virginia, where he remained in custody.

The case was assigned to Judge Robert G. Doumar, who initially denied, but on sua sponte reconsideration granted, Holmes' motion to dismiss the second indictment for lack of venue under 18 U.S.C. § 3238. *See United States v. Holmes*, 618 F. Supp. 2d 529 (E.D. Va. May 22, 2009) (Case No. 4:08cr134) (denying motion); *United States v. Holmes*, 672 F. Supp. 2d 739 (E.D. Va. Dec. 4, 2009) (Case No. 4:08cr134) (granting motion on reconsideration). Holmes contended that

---

[1]It appears from the Government's motion to dismiss the first indictment that the district court lacked jurisdiction because Holmes was still an active member of the Air Force.

venue was lacking in the Eastern District of Virginia because he had been arrested under the second indictment in North Carolina, and that arrest determined venue under § 3238. Judge Doumar agreed, finding that Holmes' "first arrest for this offense occurred in North Carolina when he was arrested on November 17, 2008 under the [second] indictment . . . as the prior arrest [under the first indictment] was without any jurisdiction. Since there was no jurisdiction to indict him in April 2008, there was no jurisdiction to arrest him at that time." 672 F. Supp. 2d at 747. Judge Doumar observed that looking solely at the second indictment, venue was proper under § 3238 where Holmes was arrested under that indictment, namely, in North Carolina rather than Virginia. *Id.* at 748. Accordingly, he concluded that venue did not lie in the Eastern District of Virginia, and he dismissed the second indictment without prejudice. *Id.* at 751.

Within hours of the second indictment being dismissed, and without having been released from the custody of the U.S. Marshals, Holmes was rearrested on a criminal complaint alleging the same charges based on the same conduct. In December 2009, the third indictment for this conduct was filed in the Eastern District of Virginia under the same statutes as in the prior indictments ("third indictment"). The third indictment is the operative indictment for the proceedings in the district court before Judge Mark S. Davis, which are presently before us on appeal.

Holmes again filed a series of pre-trial motions, including a motion to suppress his statements to the OSI agents, a motion to dismiss for lack of venue in the Eastern District of Virginia, and a motion to dismiss the indictment due to lack of jurisdiction under 18 U.S.C. § 7. The district court denied each motion. 699 F. Supp. 2d at 822.

Holmes pleaded not guilty and the case proceeded to be tried by a jury. The Friday before the Tuesday when trial was to begin, Holmes disclosed to the Government that he

intended to call Dr. Richard Ofshe as an expert witness. Holmes proffered Dr. Ofshe as an expert in confessions who would testify as to the fact that, and reasons why, individuals falsely confess to acts they did not commit. The district court granted the Government's motion in limine to exclude this testimony, citing concerns about the late timing of the disclosure and the incompleteness of the disclosure under Federal Rule of Criminal Procedure 16(b).

After a jury trial, Holmes was convicted on both counts. The district court sentenced Holmes to 262 months' imprisonment on each count, to be served concurrently. Holmes does not raise any issues regarding the trial or sentencing. He noted a timely appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Holmes contends on appeal that the district court made the following errors prior to trial, any of which would require reversal of his convictions: the denial of his motion to suppress statements made to military investigators, denial of his motion to dismiss the indictment due to the lack of venue, and exclusion of his proposed expert witness. We address each argument in turn.[2]

---

[2]Holmes also challenges the district court's denial of his motion to dismiss the indictment due to the lack of jurisdiction for extraterritorial offenses under 18 U.S.C. § 7. Holmes acknowledges that this Court's decision in *United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973), precludes his argument because *Erdos* held that § 7(3) encompasses criminal acts occurring outside the geographical boundaries of the United States. *Id.* at 160. Holmes does not argue that *Erdos* is at all distinguishable from the circumstances in his case, but instead "requests that the Court depart from its decision in *Erdos*, and interpret 18 U.S.C. § 7(3) in accordance with" the Second Circuit Court of Appeals' contrary analysis in *United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000). (Opening Br. 31.) Holmes has preserved his argument for a petition for rehearing en banc or petition for certiorari to the Supreme Court, but this panel is bound by the analysis of § 7(3) in *Erdos*, and we do not consider the issue further. *See United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005).

A.

Holmes first argues that the district court erred in denying his motion to suppress the statements (oral and written) that he made to the OSI agents in which he admitted the charged conduct. He contends the statements should have been suppressed because the "interrogation . . . was conducted under circumstances causing [Holmes'] will to be overborne, which, under the totality of the circumstances, rendered his confession involuntary." (Opening Br. 15-16.) To support this contention, Holmes points to his lengthy return trip from Qatar immediately preceding the interview, the OSI agents' failure to permit him more than twelve hours' re-acclimation prior to the interrogation, the OSI Agents' "train[ing] in interrogation techniques," the failure to record the interrogation coupled with gaps in Agent Chan's written notes of the interrogation, Agent King's statement that Holmes' career might be salvaged if he admitted to the acts, and Agent King's statement that if Holmes confessed, T.B. would be spared the trauma of testifying. Based on these factors, Holmes contends the district court erred in concluding his statement was voluntary and failing to grant his suppression motion. (Opening Br. 17-20.)

When reviewing the district court's denial of a motion to suppress, we review factual findings for clear error and the legal determination that the statement was voluntary de novo. *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005). A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the defendant knowingly, intelligently, and voluntarily waives those rights. *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997).

In considering whether a defendant's waiver is voluntary, the Court must determine "whether the confession was extracted by any sort of threats or violence, [or] obtained by

any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam) (internal quotation marks omitted). Even where "threats, violence, implied promises, improper influence, or other coercive police activity" exist, a confession is not necessarily rendered involuntary. *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). "The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." *Id.* (internal quotation marks omitted). We conduct this review by considering "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* at 781 (internal quotation marks omitted). Having reviewed the record, we conclude that the district court did not err in concluding that Holmes' confession was voluntarily made, and in denying Holmes' motion to suppress the statements on that basis.

Holmes does not deny that the OSI Agents informed him of his constitutional rights under *Miranda* before he gave his statement and that he voluntarily initialed and signed a statement saying that he understood and waived those rights prior to communicating with them about T.B.'s allegations. The record contains no indication that Agent King's statements "critically impaired" Holmes' "capacity for self-determination," *Braxton*, 112 F.3d at 780, or that Holmes' "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). As recounted above, Agent King testified at the suppression hearing that he began the interview by asking Holmes if he was tired or too sleepy to conduct the interview at that time. Holmes replied that he "felt fine." (J.A. 303.) This response was consistent with Agent King's own observations of Holmes' demeanor, physical appearance, and behavior. At no time did Holmes ask for the interview to end or indicate that he was tired, desired a break, or otherwise was unwilling to proceed. There is simply no connection in the

record between Holmes' decision to provide a statement and his physical state as a result of his return from Qatar.

But even if Holmes was tired on the day of his interrogation, suppression is not required every time a defendant has a diminished mental state. *United States v. Cristobal*, 293 F.3d 134, 141 (4th Cir. 2002) ("[A] deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary."). Rather, there would also have to be evidence that the police took advantage of Holmes' incapacitation. As we stated in *Cristobal*,

> [c]oercive police activity is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. As such, coercive police activity is also a necessary predicate to a finding that a waiver of *Miranda* rights is not voluntary. In determining whether a defendant's will has been overborne, the Court has focused on the "crucial element of police overreaching." While each case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, "all have contained a substantial element of coercive police conduct."

*Id.* at 140-41 (internal citations omitted).

There is no evidence in the record that the OSI Agents coerced Holmes into making a statement, or otherwise overreached in order to cause Holmes to confess. Holmes contends that Agent King improperly coerced a statement by observing that if he confessed, T.B. would not have to endure the pain of testifying or going through a trial. However, "a law enforcement officer may properly tell the truth to the accused." *United States v. Pelton*, 835 F.2d 1067, 1072 (4th

Cir. 1987) (quotation marks and citation omitted). Numerous cases reiterate that statements by law enforcement officers that are merely "uncomfortable" or create a "predicament" for a defendant are not ipso facto coercive. *See, e.g., id.* at 1072-73; *United States v. Shears*, 762 F.2d 397, 401 (4th Cir. 1985) ("[G]overnment agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary."). Agent King's statements fell within the acceptable ambit of truthfully reflecting how Holmes' decision whether or not to cooperate could impact T.B.

Nor is there any merit to Holmes' assertion that Agent King's statements regarding the impact of these allegations on Holmes' military career were impermissibly coercive. At the suppression hearing, Agent King testified that he expressly told Holmes that he could not say what impact these allegations would have on Holmes' career, but that he had generally known individuals charged with crimes to maintain their careers. There is no evidence in the record to contradict Agent King's testimony on this point, nor is there any evidence that Agent King made any direct or implied promises regarding Holmes' career or professional reputation that induced him to provide a statement.

Holmes' testimony at the suppression hearing further supports our conclusion. While he recounted his return trip from Qatar and summarized the interview that occurred, he did not testify to any circumstances that overcame his will. Indeed, Holmes' own explanation for why he confessed was that he could not remember not engaging in the alleged acts, and so he thought maybe he had committed them. This explanation does not indicate that he was exhausted from his trip, or that he felt threatened, or that he otherwise had been lured into confessing by something the OSI Agents said or did. Nor does Holmes' description of the interview suggest that the OSI Agents used coercion, threats, or other promises to overcome his exercise of self-determination or overcome his will such

that his confession was not voluntary. And while Holmes on appeal refers broadly to the OSI Agents' training in questioning techniques and a gap in Agent Chan's written record of the interview, he points to no specific evidence that anything occurred contrary to those notes or Agent King's description of the interview.

In light of our review of Holmes' specific arguments, and based on the totality of the circumstances surrounding the interrogation of Holmes, we hold that the district court did not err in concluding that Holmes' statement was intelligently, knowingly, and voluntarily made. Consequently, the district court did not err in denying Holmes' motion to suppress his statements.

B.

Holmes next challenges the district court's denial of his motion to dismiss the third indictment for lack of venue under 18 U.S.C. § 3238. That provision states, in relevant part: "The trial of all offenses begun or committed . . . out of the jurisdiction of any particular State or district, shall be in the district in which the offender . . . is arrested or is first brought. . . ." Holmes moved to dismiss the third indictment for lack of venue, contending that under Judge Doumar's reasoning in dismissing the second indictment, venue was proper in North Carolina, not the Eastern District of Virginia. In Holmes' view, nothing changed following his re-arrest in the Eastern District of Virginia prior to the third indictment because he had not been released from custody following the dismissal of the second indictment.

The district court denied Holmes' motion, concluding:

> venue is determined by identifying the district in which [Holmes] was first restrained on the charges now alleged in the Third Indictment. Nothing in the statute suggests that the first "arrest" requirement is

indictment-specific. That is to say, nothing in § 3238 suggests that when an indictment is filed, dismissed, and then re-filed against a defendant, the arrest on the first indictment is not controlling for purposes of assessing venue. Indeed, the statute is phrased in terms of the *offense* committed, stating that "[t]he trial of all *offenses* begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender . . . is arrested or is first brought." 18 U.S.C. § 3238 (emphasis added). This language indicates that venue is proper in the district where the defendant is first restrained in connection with the underlying *offense*, rather than any particular *indictment*.

699 F. Supp. 2d at 827. The court observed that Holmes was first arrested for the relevant offenses in the Eastern District of Virginia, and so regardless of what happened subsequent to that arrest, venue for the conduct charged was proper in that district as a result of the original arrest under the first indictment. *Id.* at 827-28.

On appeal, Holmes contends that the district court erred because the statutory requirements to establish venue in the Eastern District of Virginia were not satisfied. Relying on Judge Doumar's earlier analysis, Holmes asserts the original arrest in the Eastern District of Virginia pursuant to the first indictment was a legal nullity because there was no jurisdiction to arrest him at that time. Pointing out that his arrest under the second indictment was in North Carolina, Holmes posits that indictment could not establish venue in the Eastern District of Virginia either. Lastly, Holmes asserts his arrest in anticipation of the third indictment does not count as the "first arrest" because the only reason he was in the Eastern District of Virginia at that time was because he was still in federal custody as a result of the second indictment. Because the third arrest is the direct result of his arrest under the second indict-

ment, Holmes argues that venue would be proper in North Carolina, but not in the Eastern District of Virginia.[3]

We begin, as we must, with the text of § 3238, which establishes that venue for extraterritorial offenses "shall be in the district in which the offender . . . is arrested or is first brought."[4] Nothing in this text suggests that the provision is indictment-specific. To the contrary, the text of the statute focuses on the offense, establishing clear directions as to where venue for a specific offense is proper. The court must look at the offenses for which the defendant is facing punishment, and then determine where he was "arrested or first brought" for those offenses. Under that analysis, Holmes was first arrested on two counts of aggravated sexual assault of T.B. in the Eastern District of Virginia. We need not look any further than this first arrest for purposes of determining proper venue.

Our opinion in *United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973), is consistent with this understanding of the statute. After reviewing the evolution of the statutory language, we observed that

> the phrase in the current version of the statute that venue shall be in the district in which the offender "is arrested or is first brought" means simply "arrested" — *i.e.*, that *venue is in that district within the*

---

[3]Relying on the second part of § 3238, Holmes alternatively suggests that venue would be proper in Illinois. The salient arguments and our analysis do not require us to address that claim.

[4]The full text of § 3238 states:

The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

*United States where the offender is first restrained of his liberty in connection with the offense charged. . . .* "First brought" within the context of the statute means first brought *in custody* with liberty restrained.

*Id.* at 160-61 (citations omitted) (first emphasis added). Although *Erdos* involved a different inquiry than that presented here, its language nonetheless is consistent with reading the plain language of the statute to be offense-specific rather than indictment-specific. For purposes of establishing venue under § 3238, the relevant inquiry is not the district of arrest for a specific indictment in a case's procedural history, but rather the district of arrest for that specific offense, even if there is a subsequent dismissal of the original indictment or filing of a subsequent indictment regarding that offense.

In addition to being a straightforward reading of the statute, this understanding also comports with the purpose of establishing venue. The principle of proper venue is concerned with determining the appropriate location in which a criminal proceeding will occur. Ordinarily, "proper venue in a criminal case requires determination of where the crime was committed." *United States v. Cores*, 356 U.S. 405, 407 (1958). "[T]rial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *Id.* Although the concerns are slightly different when the crime occurs at a location outside the territorial boundaries of the United States, the focus of § 3238 is still the same — to establish where venue for a specific crime, a specific offense, is proper. It is therefore appropriate for that determination to be made according to where the offender is "arrested or first brought" the first time for the charged offenses. This analysis permits venue to be definitively determined based on the static location of where a defendant is determined to be "first arrested or brought" with respect to the offense, without requiring reevaluation of that point at each stage of any subsequent procedural develop-

ments as with subsequent or superseding indictments for the same offense.

Lastly, contrary to Holmes' assertions and Judge Doumar's earlier analysis of this issue, cases from our sister circuit courts of appeals examining § 3238 are consistent with an offense-based analysis to establish venue where an individual is "arrested or first brought." For example, in *United States v. Wharton*, 320 F.3d 526 (5th Cir. 2003), the Fifth Circuit rejected a challenge to venue where the defendant had been arrested for some offenses in Florida, then transferred to Louisiana, where the grand jury indicted the defendant on an additional charge. *Id.* at 536. The court held that the challenge to venue in Louisiana failed because the defendant "was not 'arrested' on the [additional] charge until he was in Louisiana." *Id.* Venue for that charge was thus appropriate in Louisiana. *Id.* at 536-37.

Similarly, the Second Circuit used an offense-specific inquiry in determining proper venue under § 3238. In *United States v. Provoo*, 215 F.2d 531 (2d Cir. 1954), the court analyzed a prior version of the statute, which established venue in the district where the defendant was "found," a term courts had interpreted to mean "arrested." *Id.* at 537. The defendant in *Provoo* was a serviceman arrested in Maryland on sodomy charges. Those charges were dropped, but he remained in custody and was transferred under guard to New York in order for authorities to arrest, indict, and try him for the separate crime of treason alleged to have been committed overseas. *Id.* at 537-38. The court held that venue was not proper in New York because "the army continued to hold him in Maryland after the sodomy charge was dropped solely in order to send him to New York to be tried for treason." *United States v. Catino*, 735 F.2d 718, 724 (2d Cir. 1984) (citing *Provoo*, 215 F.2d at 538). The serviceman's "continued restraint [in Maryland] 'was an apprehension for treason,'" and thus constituted being "found" in Maryland for purposes of venue under the

earlier language of § 3238. *Id.* (citing *Provoo*, 215 F.2d at 538).

This understanding expressed in *Provoo* is consistent with an offense-specific reading of § 3238 because the court's inquiry was not focused on where the defendant was first arrested for any purpose, but rather the location where he was first arrested for the specific offense charged. Thus venue was not appropriate in the location where the relevant indictment for the offense was filed (New York), but where the arrest for that offense occurred (Maryland). The Second Circuit's analysis was directed by the locale of the arrest for a particular offense, not the particular indictment authorizing arrest. *See also Catino*, 735 F.2d at 724 (quoting *Provoo* and *Erdos* to note that the location of the arrest "*in connection with the offense charged*" determines where venue is appropriate, and it is irrelevant that the arrest for the charges also could have occurred in another district).

As the district court cogently explained, any defect in the first indictment *on these same offenses* is not relevant to the ultimate determination of proper venue:

> nothing in § 3238 suggests that an arrest that is jurisdictionally defective does not still control for purposes of a determination of venue. In § 3238, Congress sought to solve the problem of *where* to try a case involving a crime occurring outside the United States. This was not an issue of jurisdiction, it was an issue of venue, i.e. *where* to try the case. Congress simply, and to some extent arbitrarily, deemed venue to be proper in the district where a defendant, charged with an offense occurring outside of the United States, "is arrested or is first brought." 18 U.S.C. § 3238. This Court must read the plain language of the statute to give effect to congressional intent. If Congress had wished to open up a [P]andora's box of legal questions with respect to

determining venue for an offense occurring abroad, it could have easily included language in § 3238 indicating that an arrest, to be controlling, must be indictment-specific, or that the arrest must be valid or without jurisdictional defect. Such questions would, however, mix venue and jurisdiction principles and significantly cloud what is otherwise a relatively straightforward method of determining venue.

699 F. Supp. 2d at 828.

Because Holmes was first arrested for the two counts of aggravated sexual abuse of T.B. in the Eastern District of Virginia, and that arrest was for the same charges for the same conduct listed in the operative third indictment, venue was proper in the Eastern District of Virginia. The district court thus did not err in denying Holmes' motion to dismiss the indictment on that ground.

## C.

Holmes' final challenge is to the district court's grant of the Government's motion in limine excluding Dr. Ofshe's trial testimony. On the Thursday before the Tuesday when trial was to begin, the Government informed Holmes that it "may offer two witnesses, as 'experts'" regarding "matters involving the military," Yokota Air Base, and "procedures in the military and at OSI." (J.A. 517.) The following day, Holmes notified the Government that he intended to call an expert witness, Dr. Ofshe, to "explain why people falsely confess and the factors that are considered." (J.A. 505.) At the Government's request, Holmes later clarified that Dr. Ofshe would not "be offering an opinion about whether . . . the statements made by [Holmes] in this case were in fact false," but would educate the jury "about the scientific research on false confessions, the fact that they occur, and some of the reasons why." (J.A. 507.) Holmes also provided Dr. Ofshe's twenty-two-page curriculum vitae.

The Government filed a motion in limine to exclude Dr. Ofshe's testimony, asserting that the notice it received failed to comply with the requirements of Federal Rule of Criminal Procedure 16(b)(1)(C) and this Court's decision in *United States v. Dorsey*, 45 F.3d 809 (4th Cir. 1995). The Government asserted that the notice was untimely, having been made "Friday afternoon, three days before trial and before a weekend," and that it did not have sufficient time to investigate the proposed testimony or Dr. Ofshe's qualifications and opinions, or locate expert witnesses to present counter-testimony. (J.A. 502.) It also alleged prejudice given the impending unavailability of key witnesses if trial were delayed to provide time to find and prepare rebuttal witnesses to Dr. Ofshe.

Holmes responded that because the parties were operating without a joint discovery order,[5] there was no fixed time by which he was required to disclose a witness and that witness' proposed testimony. And he claimed that the contents of the disclosure were specific enough to satisfy Rule 16 because they informed the Government of the nature of Dr. Ofshe's qualifications and proposed testimony. Holmes also pointed to the Government's own disclosure the day before, as well as the comparative content of the disclosures, to assert that his notice was timely and sufficiently informative.

The district court granted the Government's motion to exclude Dr. Ofshe's testimony. In its bench ruling, the court pointed to the absence of anything in the federal prosecution up to that point to suggest that the Government should have anticipated that this type of expert testimony would be offered; the lateness of the notice in light of the nature of the

---

[5]At the hearing on this motion, the parties averred that in light of the proceedings related to the first and second indictments, they had not entered into a new discovery order upon the third indictment given that neither party needed additional discovery. Both parties indicated they had been operating under the prior discovery orders, which did not specify a time frame to disclose expert witnesses.

disclosure and the Government's inability to prepare a timely response to such testimony; the insufficiency of the notice under Rule 16 because Holmes' disclosure did not "provide the bases and reasons for [Dr. Ofshe's] opinion"; and apart from Rule 16, the failure of the disclosure to inform the Government "what it is that the witness is going to specifically testify to such that a response [or] even a cross-examination could be prepared." (J.A. 566, 567.) Lastly, the district court granted Holmes' oral motion to exclude the Government's expert witnesses that had been disclosed the day before Holmes', citing the interest of fairness and similar concerns regarding timeliness as expressed when granting the Government's motion.

On appeal, Holmes reasserts the arguments he made to the district court as to why his disclosure was timely and contained sufficient information for the Government to adequately prepare for Dr. Ofshe's testimony. Holmes contends the district court abused its discretion in granting the Government's motion in limine. We do not agree.

Federal Rule of Criminal Procedure 16(b)(1) sets forth a defendant's duty to disclose information to the Government, and subpart (C) specifically deals with expert witnesses:

> The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if—
>
> > (i) the defendant requests disclosure under subdivision (a)(1)(G) and the government complies; or
> >
> > (ii) the defendant has given notice under Rule 12.2(b) of an intent to present expert

> testimony on the defendant's mental condi-
> tion.

> This summary must describe the witness's opinions,
> the bases and reasons for those opinions, and the wit-
> ness's qualifications.

Fed. R. Crim. Pro. 16(b)(1)(C). Under Federal Rule of Crimi-
nal Procedure 16(d)(2)(C), "[i]f a party fails to comply with
this rule, the court may prohibit the party from introducing the
undisclosed evidence." In addition to this specific authority,
district courts are to exercise their sound discretion in all rul-
ings related to the admission and exclusion of evidence, and
this Court will not reverse the decision to exclude such evi-
dence absent abuse of that discretion. *See United States v.
Stitt*, 250 F.3d 878, 896 (4th Cir. 2001).

Because Rule 16 is silent as to the timing of expert witness
disclosures and there is no pre-trial discovery order governing
such timing in this case, our review considers whether the dis-
trict court abused its discretion in finding that as a matter of
general fairness, Holmes' disclosure was untimely. The dis-
trict court cited *Dorsey*, 45 F.3d at 816, in reaching its deci-
sion, and we, too, find this case apposite. There, we stated:

> [T]he case law is clear that it is not an abuse of dis-
> cretion for a trial court to disallow expert testimony
> where a late proffer of evidence by the defense sub-
> stantially prejudices the government in its ability to
> find its own expert and conduct similar testing. In
> *United States v. Curry*, 977 F.2d 1042, 1052 (7th
> Cir. 1992), *cert. denied*, 113 S. Ct. 1357 (1993), for
> example, the Seventh Circuit, in holding that the dis-
> trict court did not err in excluding expert testimony
> regarding the reliability of eyewitness identifica-
> tions, found, among other things, that the district
> court did not abuse its discretion because the defen-
> dants gave the government only four days' notice of

their intent to call their witnesses. *See also United States v. Dowling*, 855 F.2d 114, 118 (3d Cir. 1988) (finding that there was no abuse of discretion in excluding expert testimony where the defendant gave the government only 5 days notice of the proposed testimony because the government "could not reasonably be expected to search for its own expert and find one available to come to the Virgin Islands in time to be given the available facts and the opportunity to assimilate them"). It is clear that Dorsey's notice to the government only on the first day of trial that he was going to call expert witnesses to testify is certainly a formidable reason in itself for the district court to have excluded the proffered expert testimony.

*Id.* (emphasis omitted). Holmes' attempt to distinguish *Dorsey* based on the disclosure in that case being made on the morning of trial is unavailing. Our rationale in *Dorsey*, and the two out-of-circuit cases relied on, is clearly applicable to the case at bar. Holmes disclosed his proposed expert witness with only three days remaining before trial, two of which fell during the weekend. The Government expressed concern, unrebutted by Holmes, as to its ability to locate and prepare adequate cross-examination and rebuttal expert witnesses in time for trial. Given these circumstances, the district court appropriately found that this consideration weighed in favor of granting the Government's motion.

But timing was not the only basis for the court's decision. The court also found that Holmes' disclosure failed to satisfy Rule 16(b)(1)(C)'s requirements as to the content of the disclosure. On this point, the language of Rule 16(b)(1)(C) is unambiguous: the disclosure must "describe the witness's opinions, *the bases and reasons for those opinions*, and the witness's qualifications." (Emphasis added.) Even assuming Holmes' disclosure provided sufficient information as to the first and third requirements, it clearly does not comply with

the second. Neither Holmes' brief synopsis of Dr. Ofshe's opinion nor Dr. Ofshe's curriculum vitae provide the bases and reasons for his proposed testimony that individuals sometimes make false confessions. Accordingly, the district court did not abuse its discretion in concluding this consideration also favored granting the motion in limine. *See United States v. Barile*, 286 F.3d 749, 758 (4th Cir. 2002) (holding no abuse of discretion in excluding testimony because the defendant's disclosure "did not describe [the witness's] opinions beyond stating the conclusion he had reached and did not give the reasons for those opinions as required under Rule 16(b)(1)(C)"); *see also United States v. Johnson*, 219 F.3d 349, 358 (4th Cir. 2000) (holding no abuse of discretion to exclude expert witness's testimony where the defendants turned over the witness's resume, but "there [was] nothing in the record that demonstrate[d] that they complied with the other requirements of Rule 16, and the transcript indicate[d] that defense counsel did not disclose the doctor's opinion to the government").

Lastly, we note that Holmes' argument relying on a comparison between the Government's disclosure and his own misses the mark. It bears repeating in this regard that the district court also *granted* Holmes' motion to exclude those witnesses. Holmes' argument thus is not relevant for purposes of determining the equity of the court's ruling. Moreover, the relevant inquiry is not whether Holmes' disclosure was more substantive than the Government's, but whether the disclosure independently satisfies the requirements of timeliness and Rule 16(b)(1)(C).

For these reasons, we cannot conclude that the district court abused its discretion in granting the Government's motion in limine to exclude Dr. Ofshe's testimony. *See United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) ("A court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual find-

ing.") (quoting *Brown v. Nucor Corp.*, 576 F.3d 149, 161 (4th Cir. 2009)) (internal quotation marks omitted).

### III.

Finding no error in the district court's pre-trial decisions, we affirm the judgment of the district court on Holmes' convictions for two counts of aggravated sexual abuse of a child.

*AFFIRMED*