AGEE, Circuit Judge,
dissenting:
The majority holds that the district court erred by allowing the Government to introduce videotaped statements that Gid-dins made to police because they occurred during the course of a custodial interrogation after an involuntary Miranda waiver. Because I conclude that the majority misapplies the relevant case law and fails to adhere to the record, I respectfully dissent.
I.
The majority first errs by determining that Giddins was “in custody” and, therefore, that Miranda warnings were necessary before the officers could question him. Miranda warnings are only required in “custodial interrogations.”[1] Illinois v. Perkins, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). “Custody under Miranda attaches where there is a ‘formal arrest’ or a ‘restraint on freedom of movement’ akin to formal arrest. This standard is ‘objective’ ” and examines the totality of the circumstances. J.D.B. v. North Carolina, 564 U.S. 261, 286, 131 S.Ct. 2394, *888 180 L.Ed.2d 310 (2011) (internal citation omitted). To determine whether an interrogation is “custodial,” courts ask whether “a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.” Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). But in making that determination, courts must not overlook that “[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime,” and that is not enough to render the interrogation “custodial.” Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam).
Here, the circumstances show that a reasonable person would have understood that he could choose not to answer the detectives’ questions and leave. Consequently, a reasonable person would have concluded that he was not in custody.
It is important to remember how the interrogation came about: Giddins went to the police station of his own volition because he wanted to retrieve his vehicle, which the police had impounded because it had been used in several bank robberies. Giddins, not the police, initiated the contact because he wanted something from them. From the outset, then, a reasonable person would understand that because he was at liberty to come to the police station for his own purposes, he was equally at liberty to leave. See, e.g., Davis v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985) (observing the “total absence of any coercion occasioned by the police” where a suspect voluntarily responded to a note left by the police requesting to speak with the suspect and the suspect waited two days before showing up at the station).
Nevertheless, Giddins contends—and the majority agrees—that he was not free to leave because the police told him they needed to ask him a few questions before he could leave with his vehicle. The district court concluded that this argument conflated the issue of whether Giddins could leave with his car with whether he could end the interview and simply leave the police station. J.A. 79-80. Without elaboration or citation to authority, the majority rejects that conclusion as a “distinction without a difference.” Majority Op. 880. To the contrary, that distinction properly centers the analysis on the constitutional inquiry: whether the interviewee can decline to answer questions and walk away from the encounter with the police. See Florida v. Bostick, 501 U.S. 429, 435-36, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). But there was nothing about Giddins’ mission to inquire about his vehicle that would have affected his perception of the freedom to leave the presence of the police without answering questions about another topic. A reasonable person would have understood from the nature of this interaction that Giddins was able to terminate the questioning had he so desired.[2]
That conclusion remains true even though, as it turned out and unknown to Giddins, the police officers also wanted to talk to him. In fact, his co-conspirators had implicated Giddins in the bank robberies *889 and the police had already shown probable cause to obtain an arrest warrant for him. But law enforcement officers’ subjective knowledge and motive do not, on their own, mean that Giddins was in custody. Rather, it is “the compulsive aspect of custodial interrogation, and not the strength or content of the government’s suspicions at the time the questioning was conducted that implicates Miranda" United States v. Uzenski, 434 F.3d 690, 704 (4th Cir. 2006) (emphasis added); accord J.D.B. v. North Carolina, 564 U.S. 261, 271, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) (stating “the subjective views harbored by ... the interrogating officers ... are irrelevant” to determining whether a person is ip custody (internal quotation marks omitted)). So what the detectives knew and what their motives were in speaking to Giddins are not relevant to the Miranda analysis.
In addition to Giddins’ voluntary appearance at the police station to discuss the return of his vehicle, no other aspect of the encounter would have caused a reasonable person to conclude he was not free to leave. As the district court found: “Giddins was not in handcuffs, and one door was unlocked. ... No weapons are visible[.] Detective Taylor’s tone was nonthreatening.” J.A. 79. See, e.g., United States v. Hargrove, 625 F.3d 170, 179-80 (4th Cir. 2010) (counting amongst the totality of circumstances that the defendant “was not handcuffed at the time of the interview, the agents did not draw their weapons ..., and the conversation was amicable and non-threatening in tone”); United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001) (same). In addition, Giddins was told he was not under arrest and could leave.[3] Under these circumstances, a reasonable person would have believed that he could end the interrogation of his own accord.
The majority points to additional facts that have limited relevance to the pertinent inquiry in an attempt to transform Giddins’ questioning into a custodial interrogation. For example, it points out that the open door to the interrogation room was “past the questioning detective” and that Giddins would have had to “walk past” the detective in order to exit through it. Majority Op. 879-81. Though our precedent acknowledges that an officer’s position in a room relative to a suspect may be relevant to the custody determination when additional circumstances are present, it also holds that an officer’s “mere presence” between the suspect and an exit is not enough to transform the encounter into a custodial one. See Hargrove, 625 F.3d at 181 (rejecting the defendant’s argument that a law enforcement officer was “blocking” the exit because “no evidence suggests that [the agent] was doing anything other than standing in the doorway” and the record did not indicate the agent “ever prevented [the defendant] from exiting, or that she threatened or coerced [the defendant] to remain in the kitchen” and concluding that “mere presence in the doorway of the kitchen was not sufficient to demonstrate that the agents restrained [the defendant’s] freedom of movement in *890 a manner consistent with being in custody”). Here, nothing suggests Detective Taylor physically curtailed or impeded Giddins’ freedom of movement at any point or that anything beyond his “mere presence” causes the majority to find this factor significant.
Moreover, by affording weight to this factor, the majority comes dangerously close to equating every interview in a police station as per se “custodial.” That course clearly contradicts precedent. See, e.g., California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (“[W]e have explicitly recognized that Miranda warnings are not required simply because the questioning takes place in the station house[J” (internal quotation marks omitted)); see also United States v. Jones, 818 F.2d 1119, 1123 (4th Cir. 1987) (“The locale in which the interrogation takes place” “is not significant to the inquiry.”); Davis, 778 F.2d at 171 (“Custody does not result merely because an individual is questioned in a ‘coercive environment[.]”). In short, there’s no reason from the record to afford any greater weight to the individuals’ positions relative to the open door than to the fact that they are in a police station in the first instance. The respective positions of Giddins and the detectives says nothing on its own about whether an individual was free to leave and, thus, cannot transform an otherwise non-custodial questioning into custodial questioning.
The majority also observes that Detective Taylor twice moved Giddins’ phone away from him during the questioning as relevant to a custody inquiry. See Majority Op. 880. But the majority’s focus on Gid-dins’ ability to consult his phone masks the real inquiry. The salient issue is not whether the police momentarily moved Giddins’ phone or asked him to turn it off, but whether a reasonable person would have believed he could stop answering questions and terminate the interview. Here, Giddins asked if he could use his phone, and Detective Taylor said “yes,” but then mentioned that they would put their cell phones aside on the table in a moment. Video at 10:27:00-10:27:10.[4] That Detective Taylor later implemented that plan by having Giddins place his phone within sight and arm’s reach on the table where the men were sitting does not mean he simultaneously curtailed Giddins’ “freedom of action ... to a degree associated with formal arrest.” Cf. Berkemer, 468 U.S. at 440, 104 S.Ct. 3138. In fact, the video shows that Giddins was also repeatedly allowed to consult his phone, respond to calls, and otherwise hold onto his phone during various portions of the questioning. And even though he was asked not to do so at other points, that does not rise to the level of restraint necessary to transform the encounter into a custodial interrogation.
For all these reasons, I conclude that Giddins was not “in custody” for Miranda purposes. That conclusion does not end the inquiry, though, because even when Miranda warnings are not required, the Government cannot introduce at trial statements procured in violation of the Due Process Clause of the Fifth Amendment. See, e.g., United States v. Cristobal, 293 F.3d 134, 139-40 (4th Cir. 2002); Hutto v. Ross, 429 U.S. 28, 40, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976).
II.
The same inquiry that informs whether a Miranda waiver was voluntary also in *891 forms whether statements were voluntary under the Due Process Clause. Cristobal, 293 F.3d at 140 (citing Colorado v. Connelly, 479 U.S. 157, 169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (“There is obviously no reason to require more in the way of a ‘voluntariness’ inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context.”)). And, regardless of whether the police had to give Giddins his Miranda warnings before questioning, the fact remains that the detectives did so here. For that reason, the inquiry turns on whether the decision to relinquish certain rights was voluntary, that is to say, whether it was “the product of free and deliberate choice rather than intimidation, coercion, or deception.” Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). An individual must understand “both the nature of the right being abandoned and the consequences of the decision to abandon it.” Id. In other words, a preponderance of the evidence must show that the waiver was “knowing and voluntary.” United States v. Robinson, 404 F.3d 850, 860 (4th Cir. 2005).[5]
The voluntariness of a waiver looks to “the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.” United States v. Holmes, 670 F.3d 586, 592 (4th Cir. 2012). “Coercive police activity is a necessary predicate to a finding that a confession is not ‘voluntary.’ ” While “severe physical abuse” and threats at gunpoint satisfy this requirement, less egregious behavior may as well. See Cristobal, 293 F.3d at 140.
A.
The majority concludes that Giddins only signed the Miranda waiver because the police “engaged in economic coercion” akin to what occurred in Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and Lefkowitz v. Cunningham, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977), by forcing him to choose between talking to the police and not obtaining his vehicle that day. Majority Op. 881-83. Not so. First, the facts of this case fundamentally differ from those in Garrity and Lefkowitz; second, the majority’s conclusion inappropriately rests on purported facts and suppositions that Giddins never raised and that are not in the record.
In Lefkowitz, the Supreme Court held unconstitutional a state statute that forced political party officers to testify in certain proceedings (i.e., “waive [their] constitutional privilege against compelled self-incrimination”) or be removed from office and barred for five years from holding other party or public offices. 431 U.S. at 802, 97 S.Ct. 2132. Similarly, in Garrity, the Supreme Court held unconstitutional a state statute that required public officials and employees to choose between waiving their right not to testify against themselves in criminal proceedings or face termination of employment as well as forfeiture of vested tenure or pensions and eligibility to hold any public office or employment. 385 U.S. at 495, 87 S.Ct. 616. In each case, the Court held that the statutes forced the employees to choose between “self-incrimination or job forfeiture” and thus did not offer any choice at all. Garrity, 385 U.S. at 496, 87 S.Ct. 616; see also Lefkowitz, 431 U.S. at 807, 97 S.Ct. 2132; Aguilera v. Baca, 510 F.3d 1161, 1171 (9th Cir. 2007) (describing these cases as establishing “that public employees cannot be compelled to choose *892 between providing unprotected incriminating testimony or losing their jobs”). As such, the statements at issue were involuntary rather than the product of free will, and they could ,not be used against the individuals in subsequent criminal proceedings. Lefkowitz, 431 U.S. at 805-09, 97 S.Ct. 2132; Garrity, 385 U.S. at. 496-500, 87 S.Ct. 616.
Lefkowitz and Garrity are inapposite here for at least two reasons. First, neither case directly considered the effectiveness of a Miranda waiver. Second, each case considered a statute that required an individual to make a direct choice between waiving his right against self-incrimination, on the one hand, and knowing he would be removed from a particular livelihood (party office, in Lefkowitz, and public office, position, or employment, in Garrity), on the other. There’s simply no comparison between the consequences in those cases and Giddins’ situation.
To overcome this false equivalency, the majority attempts to elevate the potential economic impact of any delay in recovering one’s vehicle to the certain and incomparable effect of losing one’s livelihood. The majority then compounds its error by asserting “facts” that are simply not in the record. See, e.g., Fed. R. App. Pro. 10(a); United States v. Kennedy, 225 F.3d 1187, 1191 (10th Cir. 2000) (“This court will not consider material outside the record before the district court.”); Fassett v. Delta Kappa Epsilon, 807 F.2d 1150, 1165 (3d Cir. 1986) (“The only proper function of a court of appeals is to review the decision below on the basis of the record that was before the district court.”). For example, it represents that “Giddins relied on his car to get him to his job, and it was the means of maintaining his livelihood. The threatened economic consequences for him were just as great as the threatened consequences to the [public employees] in Garrity and the political party official in [Lefkomtz].”. Majority Op. 883. But Giddins never made that argument to the district court. Nor did he put forward any evidence that he relied on his car for a job.[6] Hence, the majority creates an argument that was not preserved for appeal and which should have been reviewed only for plain error. See, e.g., United States v. Bennett, 698 F.3d 194, 200 (4th Cir. 2012) (describing the plain error standard of review the court applies to arguments a party has not preserved by raising during the criminal proceeding in district court). Here, there was no error, much less plain error.
Denying Giddins access to his car for an undetermined time simply has no correlation to the compulsive effect that animated the Supreme Court’s conclusions in Lefkowitz and Cunningham.[7] As discussed below, given that the quality and degree of the challenged police conduct determines whether it crosses the line into coercion, this fundamental difference matters.
B.
The majority also concludes that the detectives “affirmatively misled Giddins as *893 to the true nature of the investigation by failing to inform him that he was the subject of the investigation.” Majority Op. 884. In particular, they label as “improper” the responses when Giddins asked the detectives if he was in trouble. When asked, Detective Morano replied, “No, you’re here getting your car, right?” And when Giddins later asked Detective Taylor the same question, Detective Taylor replied, “Not at this point, no.” Cf. Majority Op. 888-84. The majority’s myopic focus fails to relay the entirety of these exchanges, which taints their constitutional analysis.
Looking to the complete record, Giddins asked Detective Morano if he was in trouble because Morano was taking notes, as evidenced by the interview video and Mor-ano’s fuller statement: “No, you’re here getting your car, right? No, I’ve got to take notes for my report. I mean, you understand that the car was used in a crime, right?” Cf. Video 10:20:43-10:21:11. The exchange with Detective Taylor was even more comprehensive:
Taylor: ... [Y]our car was used in crimes, we need to dig in and find out what’s going on with your, with these three girls, what your relationship with them is, how they came in contact with your car, all that stuff. Understand that?
Giddins: Yes, I understand that. What I’m asking—
Taylor: OK.... Do you mind explaining that stuff to us?
Giddins: I don’t know any of that stuff.
Taylor: Well we don’t know that until I ask you, right?
Giddins: Right, but I just told you. That’s what I’m asking, like. Is this, like, the procedure to get my ear back?
Taylor: Yes, in order for us to ask you questions because the vehicle was used in a crime, by law, we have to go over these rights.
Giddins: Right.
Taylor: If we start asking you stuff and you don’t want to talk to us, then don’t talk to us.
Giddins: OK.
Taylor: But we’re just trying to figure out some issues.
Giddins: But I can still get my car?
Taylor: There is, before I release the car to you, I would like to know some answers.
Giddins: That’s what I’m asking. That’s what I’m asking.
Taylor: I would like to know some answers before we release your car back.
Giddins: That’s what I’m asking. Yea, that’s all.
Taylor: We’ll explain everything to you.
Giddins: OK, I’m not in trouble or anything, am I?
Taylor: Not at this point, no. We’ll find out what’s going on. So long as you don’t have, you know, sit there and tell me you were hiding in the trunk and you escaped when the police pulled them over, no.
Giddins: Hiding in the trunk—
Taylor: You weren’t hiding in the trunk were you?
Giddins: I was at work.
Taylor: OK, then what do you have to worry about?
Video at 10:30:08-10:31:24.
Viewing the exchanges in context focuses the character of the isolated statements the majority relies on and shows that the totality of the detectives’ responses did not improperly compel or coerce Giddins to speak with them. See Perkins, 496 U.S. at 297, 110 S.Ct. 2394 (observing police offi *894 cers are allowed to “mislead a suspect or lull him into a false sense of security [so long as the conduct] do[es] not rise to the level of compulsion or coercion” that violates Miranda). The majority elides the context in which the detectives told Gid-dins he was not “in trouble.” The entirety of the exchange negates any concern that Giddins was misinformed about the nature of the questions he would be asked or the potential that he would be deemed a suspect. The totality of the exchanges signaled—truthfully—that they wanted to discuss how Giddins’ vehicle came to be used in a bank robbery. Moreover, Detective Taylor expressly told Giddins—again, truthfully—that Giddins did not have to answer any questions he didn’t want to. In addition, his momentary reassurance that Giddins was not “in trouble,” was immediately caveated by words plainly informing Giddins that if Giddins were involved in the robbery, then his position would be different.
What’s more, the Supreme Court has never considered whether an affirmative representation about the scope of an interrogation would render a Miranda waiver involuntary. Colorado v. Spring, 479 U.S. 564, 577 n.8, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (expressly reserving that issue). But that Court has held that “a valid waiver does not require that an individual be informed of all information useful in making his decision or all information that might affect his decision to [talk to the police].” Id. at 576, 107 S.Ct. 851. What’s more, the Court has “never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.” Id. at 576-77, 107 S.Ct. 851. Similarly, this Court has previously recognized that equivocal statements suggesting that a suspect may not be charged, absent a more definite promise to that effect, do not “critically impair” an individual’s “ ‘capacity for self-determination’ ” or otherwise cause their will to be “ ‘overborne in such a way as to render his confession the product of coercion.’ ” United States v. Byers, 649 F.3d 197, 216 (4th Cir. 2011) (quoting Arizona v. Fulminante, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). More to the point, this Court also has held, “misrepresentations are insufficient, in and of themselves, to render a confession involuntary.” United States v. Whitfield, 695 F.3d 288, 302 (4th Cir. 2012).
All this is to say, even if part of the detectives’ responses suggested Giddins was not in trouble, that’s not enough to create a constitutional problem. Here, the detectives’ combination of truthful statements and passing reassurances did not rise to the level of deceptiveness that implicated Giddins’ due process rights. See United States v. Holmes, 670 F.3d 586, 592-93 (4th Cir. 2012) (recognizing “that situations that make an individual “uncomfortable or create a predicament for a defendant are not ipso facto coercive” (internal quotation marks omitted)).
C.
Even assuming that the majority is correct that either maintaining possession of Giddins’ vehicle or reassuring Giddins gave rise to concerns about coercion, those acts still did not violate Giddins’ due process rights because the totality of the circumstances demonstrate that they did not render his Miranda waiver involuntary. To be sure, Giddins faced a choice, but it remained a voluntary choice so long as the detectives did not cause his “will [to] have been overborne and his capacity for self-determination critically impaired.” See Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); see also United States v. Braxton, 112 *895 F.3d 777, 780 (4th Cir. 1997) (“[T]he mere existence of ... implied promises, improper influence, or other coercive police activity ... does not automatically render a confession involuntary.”).
Based on the full record, I conclude that Giddins voluntarily answered the detectives’ questions. Giddins was not in custody, but rather came voluntarily to the police station desiring to recover his vehicle. He then learned that the police intended to question him about how that vehicle came to be used in a bank robbery, including his relationship with the women who had been arrested. Unlike many subjects of interrogation whose statements are nonetheless deemed voluntary, Giddins knew—and, indeed, anticipated—the true subject matter of the interview. And although the detectives did not tell Giddins he was a suspect or that they had an arrest warrant for his arrest, nothing required them to alert Gid-dins to either fact as part of his decision-making process. See Connelly, 479 U.S. at 176-77, 107 S.Ct. 515. The conversation remained civil and conversational, with both detectives maintaining a cordial, nonthreatening demeanor throughout the exchange. In addition, Giddins had a criminal record, making him familiar with Miranda and his constitutional rights even before Detective Taylor presented him with the Miranda waiver. See United States v. MeClinton, 982 F.2d 278, 283 (8th Cir. 1992) (observing that a defendant’s criminal record demonstrated familiarity with the criminal justice system, which decreased his susceptibility to pressure and, thus, his likelihood to make an involuntary statement to police). Lastly, Giddins points to no other impairment that would have affected his decision-making capacity that day.
In sum, nothing about the setting, the detectives’ statements, or Giddins’ background suggests that his will was overborne or that his capacity for self-determination was substantially impaired at the time he signed the Miranda waiver and decided to continue talking to police. Instead, the record shows that Giddins made an “essentially free and unconstrained choice” to waive his rights and speak with the detectives. See Abu Ali, 528 F.3d at 234; see also Connelly, 479 U.S. at 170,107 S.Ct. 515 (“The voluntariness of a waiver ... has always depended on the absence of police overreaching, not on ‘free choice’ in any broader sense of the word.”). Accordingly, the waiver was effective and no due process violation occurred. See Holmes, 670 F.3d at 591.
[[Image here]]
For all these reasons, I conclude the majority fails to assess correctly the relevant analysis for when an individual’s voluntary statements to law enforcement can be used against him at trial. Therefore, I respectfully dissent and would affirm the judgment of the district court.[8]

. It is undisputed that Giddins was “interro- • gated.”

. For the reasons discussed in the voluntariness section below, infra II.A, any influence the police had because of the impounded car does not rise to a level that would implicate Giddins' Fifth Amendment rights. See United States v. Jamison, 509 F.3d 623, 628-30 (4th Cir. 2007) (cautioning that "factors independent of police restraint," i.e., those "separate [from] the restrictions on his freedom arising from the police interrogation [as opposed to] those incident to [a suspect’s] background circumstances,” do not cause the encounter to be custodial).

. While the majority correctly quotes our precedent that "such a statement is not talis-manic or sufficient in and of itself to show a lack of custody,” Majority Op. 880 (citing United States v. Hashime, 734 F.3d 278, 284 (4th Cir. 2013)), the majority errs because it gives that factor no weight. It is one of the circumstances properly considered as part of the totality. E.g., United States v. Colonna, 511 F.3d 431, 436 (4th Cir. 2007) (“[T]he officer’s statement [that the suspect is not under arrest] was only one of several factors in our calculus of determining custody—not a dis-positive factor[.]”); Davis, 778 F.2d at 171-72 (“[I]nforming a suspect that he is not under arrest is one factor frequently considered to show a lack of custody[.]”).

. I adhere to the majority opinion’s approach of citing to the time stamp for the video exhibit. Cf. Majority Op. 875 n.1.

. Giddins does not argue that his waiver was made unknowingly, as the Miranda waiver set out his constitutional rights.

. To be sure, Giddins asserted in passing that the police used his "interest in getting his car returned as leverage” for talking to them. J.A. 53. But neither his motion to suppress nor his memorandum in reply connect his immediate possession of the vehicle to his ability to maintain employment or any other heightened consequences.

. There’s nothing in the record about the monetary value of Giddins' Ford Focus or even whether it was his only means of transportation. The record is also silent as to what the normal Baltimore County police procedure is for returning property that has been used in a crime. On appeal, Giddins asserts— without any authority—that he would have had to abandon his property interest in the vehicle permanently. There’s no indication in the record that the police had or implied that they had such Draconian authority.

. Because I conclude that no constitutional error occurred, let alone reversible error, affecting Giddins' conviction, I would ordinarily need to address the sentencing issue Gid-dins raised on appeal. That issue challenged the district court’s decision to sentence him as a career offender under U.S.S.G. § 4B1.1. Both Giddins and the Government assumed that U.S.S.G. § 4B1.2's definition of a crime of violence would be modified by Johnson v. United States, - U.S. -, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), such that the Guidelines’ residual clause would be declared unconstitutional. After briefing, the Supreme Court issued its decision in Beckles v. United States, - U.S. -, 137 S.Ct. 886, 197 *896 L.Ed.2d 145 (2017), which held that "the advisory [Sentencing] Guidelines are not subject to vagueness challenges under the Due Process Clause,” so the residual clause of § 4B 1.2(a)(2) remains constitutional. Id. at 890. Beckles thus forecloses Giddins’ argument on this issue.
Lastly, Giddins argues—for the sake of preservation only—that the district court erred by denying his motion to suppress cell site location information obtained from his cell phone. I agree with footnote 5 of the majority’s opinion noting that Giddins has preserved the issue, but that our en banc decision in United States v. Graham, 824 F.3d 421 (4th Cir. 2016), forecloses that argument.