**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-4039

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MASTER GIDDINS,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. William D. Quarles, Jr., District Judge. (1:14-cr-00116-WDQ-1)

Argued: January 25, 2017                    Decided: June 6, 2017

Before KING, AGEE, and FLOYD, Circuit Judges.

Reversed by published opinion. Judge Floyd wrote the majority opinion, in which Judge King joined. Judge Agee wrote a dissenting opinion.

**ARGUED:** Meghan Suzanne Skelton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Kenneth Sutherland Clark, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Debra L. Dwyer, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

FLOYD, Circuit Judge:

Appellant Master Giddins was convicted of bank robbery and conspiracy to commit bank robbery following a jury trial. Part of the evidence used at trial was a videotaped statement Giddins gave to police during the investigation into the crime. On appeal, Giddins argues that the statement was coerced, and that he did not voluntarily waive his Fifth Amendment rights. We agree, and find that harmless error cannot save the conviction in light of this constitutional trial error. As a result, we reverse Giddins's conviction. We need not address the additional issues Giddins has raised regarding sentencing.

## I.

### A.

Over the course of three days in September 2013, three different bank robberies were committed in and around Baltimore, Maryland. The first robbery occurred on September 25, 2013, when someone wearing women's clothing and a black wig entered the M&T Bank in Baltimore, Maryland. That person handed the teller a note stating that the person had a bomb, and demanded that money be placed into a black and white polka dot cosmetic bag, which was handed to the teller. After obtaining the money, the robber fled the bank, was driven away in a waiting vehicle, and discarded a GPS tracker the teller had placed in the bag, to which wig fibers were attached. Police later determined that the robber was Appellant Master Giddins, that the getaway car was his silver Ford Focus, and that the getaway driver was Czekiah Fludd.

The next day, September 26, 2013, Giddins lent his car to Fludd and Ashley Fitz, whom Giddins was dating at the time. Fitz and Fludd drove to an Exxon station to obtain blank lottery tickets, on which one or both of them wrote a note similar to the note used in the September 25th robbery. They then drove to the First Mariner Bank in Owing Mills, Maryland, where Fitz entered the bank wearing a black wig and carrying a black and white polka dot cosmetic bag. After handing the bag and note to a teller, Fitz was given cash, and then ran from the bank. A construction worker saw Fitz and Fludd get into Giddins's car, and the Exxon station recorded the pair on video obtaining the blank lottery tickets.

The following day, September 27, 2013, Giddins again lent his car to Fitz and Fludd. They, along with a third person, Alexis Chandler, robbed the Baltimore County Savings Bank in unincorporated Baltimore County, Maryland. Fitz and Chandler both entered the bank wearing wigs, gave notes that they had a bomb, and demanded money. Fitz was given a dye pack along with her money, which exploded on the way back to the car. Fitz threw the bag out of the window, and additional items were discarded. When the three women went back to try to obtain the bags, they were stopped for matching the description of the bank robbery suspects. They were ultimately arrested, and the car was seized.

After their arrest, Fitz and Chandler provided statements to the police and admitted involvement in the September 27th robbery. Fitz additionally admitted to participating in the September 26th robbery and implicated Giddins. Fitz told police that the September 26th robbery was committed using Giddins's car, that Giddins had been present when both robberies were planned, and that Giddins had been involved in the September 25th robbery.

3

Based on the statements and evidence, Detective William Taylor of the Baltimore City Police Department applied for and obtained a warrant for Giddins's arrest from a Commissioner of the District Court of Maryland for Baltimore City. *See* Gov't Suppl. Authority Ltr., Attach. 1, ECF No. 65-2 [hereinafter, the "Warrant"]. The Warrant was issued on October 3, 2013 at 10:20 am. *Id.*

B.

On or about October 4, 2013, Giddins was informed by Baltimore County Police that they had his car and that it had been used in a bank robbery. On the morning of October 4th, Giddins went to Baltimore County Police headquarters in order to retrieve his car. Upon arrival, Giddins was taken to an interview room by Detective Steve Morano of Baltimore County Police Department and an unknown member of the department. Giddins's interactions with police officers from the time he entered the interrogation room were recorded on video.[1] The interrogation room was set up with an oblong, almost rectangular table on the side of the room with one long end of the table against the wall; there was one chair per free side of the table, Giddins was seated on one of the short sides, and Det. Morano sat on the long side. There were also two doors to the room—one

---

[1] The video is contained in the record as a separate attachment to the J.A, with a cover sheet contained at J.A. 64. The government on request of the Court submitted a transcript of the video. Gov't's Ltr. re: Transcript Request, Attach., ECF No. 63-2. Although the Court is appreciative of the government's transcript, it was not always entirely accurate based on the Court's own viewing of the video. As such, quotes from the video contained in this opinion are based on both the government's submitted transcript and corrections from the Court's own review. Citations to quotes are therefore given by time stamp rather than citation to a page in the transcript.

immediately behind Giddins within his arm's reach, and one approximately five feet behind Det. Morano, outside the camera's view.

1.

After entering the room at 10:17:35 am and sitting down, Det. Morano copied down Giddins's license information. At 10:17:58, the unknown member of the department left the room through the door behind Giddins, which was also the door through which the three had entered the room. Upon leaving, he audibly locked the door, causing Giddins to turn his head toward the door.

Det. Morano asked Giddins to whom he lent his car, and Giddins replied that he lent it to Fludd. Det. Morano informed Giddins that Fludd was locked up, and continued asking details about when and why Giddins lent Fludd his car, the frequency with which Giddins would lend Fludd his car, and whether Fludd was going through any hard times. At 10:20:55, Giddins asked Det. Morano, "Am I in trouble?" to which Det. Morano replied, "No, you're here getting your car right?" and went on to explain that he was taking notes for a report because the car was used in a crime. At 10:21:25, Det. Morano got up to leave and informed Giddins that he had to complete some paperwork and would be right back. After checking that the door behind Giddins was in fact locked, Det. Morano left through the second door.

At 10:22:56, Det. Taylor from Baltimore City Police entered the room through the second door, explained that Det. Morano had become busy with something else, and that

5

Det. Taylor would be taking over.[2]  Det. Taylor sat down in the seat vacated by Det. Morano, and began going over the same biographical information with Giddins.  At 10:23:31, "Mr. Kim" entered the room, purportedly as a trainee detective observing the situation, and sat down at the remaining seat at the other short end of the table opposite Giddins.[3]  Det. Taylor then continued asking Giddins biographical information.  Giddins asked if he could take a call at 10:27:02, and Det. Taylor told him that he could, but that it needed to be "real quick" and then everyone was going to "put their phones up."  At 10:27:25, Det. Taylor placed his phone on the table and indicated that Giddins should do the same.  Giddins put his phone on the table by him, and Det. Taylor picked it up, moving both of their phones to the end of the table farthest from Giddins and closest to Kim.  Giddins phone began ringing again at 10:27:42, and Det. Taylor handed the phone back to Giddins, but told him to "go ahead and turn it off for a couple of minutes."

Det. Taylor produced a *Miranda*[4] waiver around 10:28:12 and told Giddins that they had to read him his rights because his car was involved in a crime.  He told Giddins, "It doesn't mean you're under arrest, it doesn't mean you're being charged with anything.  But since we're asking you questions, by law we have to read you your rights, OK?  (pause) I'm kind of interested to find out what's going on with these three young ladies who

---

[2] At the time, it was unknown to Giddins that Det. Taylor and Det. Morano were from different agencies.

[3] Kim was later revealed to Giddins to be FBI Special Agent Sung Kim.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

decided to use your car in a crime." Det. Taylor passed the *Miranda* waiver to Giddins at 10:28:46 and instructed him, "What I want you to do is read each one out loud to me, stop at the end of each one. If you understand what it says, write the word 'yes' and put your initials next to it. If you have any questions, you can ask me, OK?" Giddins then began reading each right aloud, and when he confirmed that he understood, Det. Taylor instructed him to write "yes" next to the statement.

At the bottom of the form, after reading each individual right, the form required a full signature after the statement, "I have been advised of and understand my rights. I freely and voluntarily waive my rights and agree to talk with police without having an attorney present." Det. Taylor asked at 10:30:31, "You don't have any questions with us asking about your car, do you?" Giddins responded, "Yes. Is this the procedure for me to get my car back? Like—cause I feel like—," and Det. Taylor responded, "Yeah, we do, but like I said, your car was used in crimes that we need to—we need to dig in and find out what's going on with your—with these three girls, what your relation with them is, how they came in contact with your car, all that stuff." Giddins replied that he understood, and Det. Taylor asked, "Do you mind explaining all that stuff to us?"

After then stating that he "d[id]n't know any of that stuff," Giddins asked at 10:30:36, "That's what I'm asking, like, is this, like, the procedure for me to get my car back?" to which Det. Taylor responded, "Yeah—in order for us to ask you questions, because the vehicle was used in a crime, by law, we have to go over these rights. If we start asking you stuff and you don't want to talk to us, then don't talk to us. But we're just trying to figure out some issues." Giddins asked again, "But do I still get my car?" and

7

Det. Taylor responded, "Before I release the car to you, I would like to know some answers. . . . I would like to know some answers before we release your car back to you." Giddins said, "That's what I'm asking," and then Det. Taylor told him, "We'll explain everything to you."

Giddins then asked Det. Taylor, "I'm not in trouble or anything, am I?" Det. Taylor answered, "Not at this point, no. We'll find out what's going on. So long as you don't have—you know—you don't sit there and tell me you were hiding in the trunk and you escaped when the police pulled them over, no. Right? You weren't hiding in the trunk, were you?"

When Giddins smiled and shook his head, Det. Taylor said, "Then what do you have to worry about?" Giddins said, "I don't have anything to worry about, I just don't like how I feel like I'm being interrogated—and y'all just—" and Det. Taylor interrupted, "You're not being interrogated, you're free—" to which Giddins interjected, "You gotta understand what I'm saying." Det. Taylor told him, "I know, I understand you, you're nervous. Because your car was used in a crime. I'd be nervous, too."

Giddins then said, "I didn't do anything, and it's like—" and Det. Taylor interrupted again, "Did I say you did anything?" Giddins responded, "No, I'm like, I'm in a closed room, two guys are here, they locked the doors—" and Det. Taylor, indicating to the door behind him and farthest from Giddins, replied, "The doors aren't locked, the doors are wide open." Giddins then grabbed the door handle immediately behind him and showed how the knob was locked. Det. Taylor said, "Well that one is. You can't get in on the other side of that door. Why you think we have to come in that door?" indicating to the one

8

unlocked door. Giddins said, "But you understand what I'm saying?" Det. Taylor retorted, "Are you handcuffed?" Giddins responded, "No, but you understand—" and Det. Taylor said, "Oh, I understand you." Giddins then signed the *Miranda* waiver at 10:32:10.

## 2.

During the next fifteen minutes, the questioning continued. Det. Taylor asked Giddins about where he was during each of the three robberies, his relationship with Fludd, Fitz, and Chandler, and other topics. Giddins responded that he was meeting with his parole officer during the September 25th robbery. Det. Taylor periodically asked questions that required Giddins to look at his phone, and each time after Giddins finished, Det. Taylor instructed him to put his phone back up and away from him. Giddins also told Det. Taylor that he had been in trouble at work two days previously for using his phone while at work. Additionally, Giddins told Det. Taylor that he had been off from work on September 23rd and 24th, but at work on September 25th.

Finally, at 10:47:31, Det. Taylor showed Giddins a surveillance photo of the robber from the September 25th robbery and told Giddins that he was the robber. When Giddins denied that, Det. Taylor laid out the case for why he suspected Giddins of bank robbery. At 10:50:00, Giddins invoked his Fifth Amendment right to counsel by stating, "No further questions," and asking for a lawyer, at which point questioning immediately ceased. Det. Taylor seized Giddins's cell phone at 10:50:06, prying it from Giddins's hands and telling him "I'll take that." At 10:50:09, Det. Taylor formally informed Giddins that he was under arrest for bank robbery. At 10:50:15, Det. Taylor cuffed Giddins, and at 10:50:36, Det.

9

Morano re-entered the room through the previously locked door. Giddins was taken out of the interrogation room to be taken to Baltimore City jail at 11:11:37, at which point the videotape stops.

C.

Giddins was indicted by a federal grand jury in the District of Maryland on three counts of unarmed bank robbery, in violation of 18 U.S.C. § 2113(a) and (f), and one count of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371. Giddins moved to suppress the statements given to police before trial began. A hearing was held at the start of the trial before jury selection began, and the district court denied the suppression motion by written memorandum opinion. *See United States v. Giddins*, 57 F. Supp. 3d 481 (D. Md. 2014).[5]

During the course of trial, the video was played for the jury, and the government referred to the video and the statements Giddins made in it during both opening statement and closing argument. The jury convicted Giddins on one count of bank robbery for robbing the M&T Bank on September 25th and one count of conspiracy to commit bank

---

[5] Giddins also moved to suppress cell site location information (CSLI) obtained from his cell phone without a warrant, suppression of which was also denied. Giddins appeals that issue to us as well, and this appeal was held in abeyance pending this Court's decision in *United States v. Graham*, 824 F.3d 421 (4th Cir. 2016) (en banc), *pet. for cert. filed*, No. 16-6308 (U.S. Sept. 26, 2016) and No. 16-6694 (U.S. Oct. 27, 2016). In *Graham*, we decided that "the government does not violate the Fourth Amendment when it obtains historical CSLI from a service provider without a warrant." 824 F.3d at 425. As such, Giddins "raises this issue in order to preserve it for further review," but acknowledges that *Graham* controls. Appellant's Br. at 53. We note the issue, but reject it as a grounds for appeal here in light of *Graham*.

10

robbery, but acquitted him of the other two bank robbery counts. Giddins timely noted this appeal following his sentencing, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

"When reviewing the district court's denial of a motion to suppress, we review factual findings for clear error and the legal determination that the statement was voluntary de novo." *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012) (citing *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005)). "A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the defendant knowingly, intelligently, and voluntary waives those rights." *Holmes*, 670 F.3d at 591 (citing *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997)).

## III.

Although Giddins frames the issue in his appeal primarily as whether the statements were voluntary, and discusses the voluntariness of the *Miranda* waiver only secondarily, in actuality it is the *Miranda* waiver issue that is decisive in this case. Indeed, all arguments by both Giddins and the government are directed toward the remarks made by police in the immediate timeframe of the *Miranda* waiver. Although Giddins argued below that the pre-waiver statements were also involuntary, that argument is not clearly raised before us here. Further, most of the pre-waiver statements appear to be regarding simple biographical booking information, to which no special concerns under the Fifth Amendment apply. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).

11

A.

Concerns under *Miranda* only arise when a defendant is in custody and subjected to interrogation. *Montejo v. Louisiana*, 556 U.S. 778, 794 (2009); *see also Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) ("[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."). The parties do not dispute that Giddins was subject to interrogation. Therefore, the issue of whether *Miranda* applies turns on whether Giddins was in custody.

The government first submits that Giddins was never in custody prior to his formal arrest, so no warnings under *Miranda* were even necessary. We disagree. "When deciding whether a defendant not under formal arrest was in custody—and thus if the *Miranda* requirements apply—a court asks whether 'under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest.'" *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013) (quoting *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001)) (further internal quotation marks and alterations omitted). It is an objective inquiry, and essentially asks "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 282–83 (internal quotation marks, alterations, and citations omitted). This determination "calls for application of the controlling legal standard to the historical facts . . . . [and thus] presents a 'mixed question of law and fact' qualifying for independent review." *Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995). "Facts relevant to the custodial inquiry include, but are not limited to, 'the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers,

12

the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.'" *Hashime*, 734 F.3d at 283 (quoting *United States v. Day*, 591 F.3d 679, 696 (4th Cir. 2010)).

In concluding that Giddins was not in custody, the district court made findings of fact to support that conclusion:

> Giddins voluntarily entered the police station to obtain the return of his car. Giddins was not in handcuffs, and one door was unlocked. Two investigators were present; one asked questions while the other remained silent. No weapons are visible in the recorded interview. Detective Taylor's tone was nonthreatening. Although an arrest warrant had issued, Giddins was apparently unaware of this fact and, thus, it does not alter the objective inquiry.

*Giddins*, 57 F. Supp. 3d at 489 (citations omitted).

These findings are not clearly erroneous, and thus guide this appeal. However, the findings of the district court are not complete on this, and fail to paint the full picture. It is true that one door was unlocked in the interrogation room, but it was the door past the questioning detective. The door immediately behind Giddins was locked, so in order to leave the room, Giddins would have had to walk past Det. Taylor. Additionally, at least twice during the interrogation, Det. Taylor moved Giddins's phone away from Giddins. Although Det. Taylor did tell Giddins that he was free to leave, "such a statement 'is not talismanic or sufficient in and of itself to show a lack of custody.'" *Hashime*, 734 F.3d at 284 (quoting *United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010)).

Finally on the custody inquiry, there is the issue of Giddins's car. The district court rejected the argument, repeated here on appeal, that Giddins was not able to leave the interrogation room because he believed that if he terminated the interview, he would not

13

have his car returned to him. The court found "[t]hat Giddins may have believed that terminating the interview would prevent the return of his car does not mean that Giddins felt unfree to leave." *Giddins*, 57 F. Supp. 3d at 489. We find that this is a distinction without a difference.

As stated above, the custody inquiry is an objective one and does not consider "the subjective views harbored by either the interrogating officers or the person being questioned." *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) (internal quotation marks and citations omitted). We must still, however, consider how a reasonable person would have understood the situation. The purpose of not considering subjective views is to "avoid[] burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." *Id.* (citations omitted). Keeping this in mind, we fail to see how a reasonable person would have perceived the situation as permitting him or her to leave the room freely. A reasonable person would have felt unable to cease the interview and thus forfeit the opportunity to obtain the return of his or her property. As we explain in more detail in Section III.B.1, *infra*, Giddins's car was essential to his livelihood and something he needed returned to him. Considering the totality of the circumstances,[6] Giddins was in custody, and *Miranda* warnings were required for any non-booking questions.

---

[6] In disagreeing with our conclusion, our dissenting colleague cites to cases where each of the factual circumstances discussed above was *alone* insufficient to transform an encounter with the police into a custodial situation. We do not disagree that individually each of these factual circumstances would not suffice to establish custody. However, to properly perform the totality of the circumstances analysis, we must consider how the

B.

Having concluded *Miranda* warnings were necessary, we now turn our attention to the *Miranda* waiver. Giddins submits that both the questioning and waiver were involuntary and the result of coercion. We agree.

Coercive police activity is a necessary finding for a confession or a *Miranda* waiver to be considered involuntary. *United States v. Cristobal*, 293 F.3d 134, 140–141 (4th Cir. 2002) (citations omitted). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination is critically impaired." *United States v. Braxton*, 112 F.3d 777, 780–81 (4th Cir. 1997) (en banc) (internal quotation marks and citations omitted). "The Government bears the burden of proving by a preponderance of the evidence that the statement was voluntary." *Braxton*, 112 F.3d at 781 (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)). Having reviewed the record, we conclude that the government failed to meet its burden here, and that the district court erred in concluding otherwise.

"[C]oercion can be mental as well as physical, and the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Arizona v. Fulminante*, 499 U.S.

combination of these factual circumstances would affect a reasonable person in Giddins's position. It is therefore not dispositive that no single factor that we have examined could on its own create a custodial situation. Our conclusion that the situation here was custodial is based on all of these circumstances combined, i.e., in totality.

15

279, 287 (1991) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)) (internal quotation marks and alterations omitted). There are two problems here: (1) the police made it appear that if Giddins did not answer their questions, he would not be able to get his car back; and (2) Det. Taylor lied to Giddins when Giddins directly asked if he was in trouble. We address each in turn.

1.

Giddins argues that the police engaged in economic coercion by forcing him to "choose between surrendering his Fifth Amendment rights or incurring adverse economic consequences." Appellant's Br. at 14. He bases his argument on two Supreme Court cases: *Garrity v. New Jersey*, 385 U.S. 493 (1967), and *Lefkowitz v. Cunningham*, 431 U.S. 801 (1977). The government argues that these two cases are distinguishable from Giddins's situation and do not have the far-reaching consequences that Giddins urges us to accept here.

In *Garrity*, four police officers were investigated in relation to allegations of ticket fixing in certain boroughs of New Jersey. 385 U.S. at 494. Each officer was informed that if he invoked his privilege against self-incrimination, then he would be subject to removal from office pursuant to state statute. *Id.* The officers answered the questions, and "[o]ver their objections, some of the answers given were used in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws." *Id.* at 495. They appealed, arguing that the statements were coerced "by reason of the fact that if they refused to answer, they could lose their positions with the police department." *Id.*

16

The Court in evaluating the situation held that the statutory scheme was coercive:

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in [*Miranda*, 384 U.S. at 464–65,] is "likely to exert such pressure upon an individual as to disable him from making a free and rational choice." We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

*Garrity*, 385 U.S. at 497–98 (footnote omitted). The Court went on to remark that "there are rights of constitutional stature whose exercise a State may not condition by the exaction of a price. . . . We now hold the protection of the individual . . . against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office . . . ." *Id.* at 500.

A decade later, in *Cunningham*, a similar situation arose. Under New York law, a political party officer was required to testify about the conduct of his or her office, and failure to do so would result in immediate termination and a five-year prohibition on holding any other party or public office. *Cunningham*, 431 U.S. at 802–803. A party officer was subpoenaed to appear before a grand jury that was investigating his conduct while holding unsalaried party positions. *Id.* at 803. He appeared and refused to sign a waiver of immunity which included a Fifth Amendment waiver, and as such was immediately divested of his party offices and subject to a five-year ban on holding any public or party office. *Id.* at 803–04.

The Court explained that its prior cases up until that point "ha[d] established that a State may not impose substantial penalties because a witness elects to exercise his Fifth

17

Amendment right not to give incriminating testimony against himself." *Id.* at 805. The Court found that the case law was settled "that government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized," concluding that "the touchstone of the Fifth Amendment is compulsion." *Id.* at 806. In evaluating whether or not the law was improperly coercive, the Court considered reputational damage to the official and the loss of "potential economic benefits realistically likely of attainment" by the official should he refuse to testify, finding that each provided an independent basis for finding the law coercive. *Id.* at 807. As such, the Court found the state law unconstitutional. *Id.* at 808–09.

Giddins here argues that *Garrity* and *Cunningham* control, because the police threatened to indefinitely retain his car if he failed to sign the *Miranda* waiver and answer their questions. The government argues contrarily that a delay in returning Giddins's car is not the equivalent of the threatened economic coercion in *Garrity* and *Lefkowitz*; however, we cannot agree. We must consider the realities of the circumstances, and compare apples to apples. No one contends that Giddins was enjoying a position of public trust such as the officers in *Garrity* or the political party official in *Cunningham*. But we cannot consider the threatened economic consequences to Giddins as being any less severe simply because Giddins may not have held as "prestigious" of a position. Giddins relied

18

on his car to get him to his job, and it was the means of maintaining his livelihood.[7] The

threatened economic consequences for him were just as great as the threatened

consequences to the police officers in *Garrity* and the political party official in

*Cunningham*.

When Giddins asked whether filling out the *Miranda* waiver and answering the

officers' robbery-related questions was the normal procedure for obtaining his car, Det.

Taylor answered in the affirmative. It does not matter that Det. Taylor's answer included

a truthful statement—that in order to question Giddins they needed him to sign the *Miranda*

waiver. What matters is how a reasonable person would have understood the responses to

the questions asked; Det. Taylor's responses indicated that if Giddins failed to sign the

---

[7] Our dissenting colleague faults us for relying on this point, and argues that this is not in the record and thus not preserved for appeal. *See post* at 37–39. We disagree. Although Giddins did not flesh this point out with perfect clarity in the district court below, his attorney made clear to the district court that there was "a certain amount of leveraging of the return of the car as well." J.A. 109; *see also* J.A. 53 ("The Detectives . . . us[ed] Mr. Giddins' interest in getting his car returned as leverage."). Further, Giddins expressly made this argument in his opening brief to this Court. *See* Appellant's Br. at 16 ("Mr. Giddins was faced with losing his vehicle, which was his means of maintaining his livelihood, unless he answered the detectives' questions."); *id.* at 17 ("His vehicle enabled him to travel to and from his current job."). We believe this is enough for Giddins to preserve the issue and enables him to argue it here. Finally, even if not adequately preserved below, the government did not argue before this Court that Giddins had in any way waived this argument in its opposition brief—a position the government clearly knew how to take. *Compare* Appellee's Br. at 18–19 (responding to the economic coercion argument) *with id.* at 25–26 (arguing that Giddins waived his ability to object to his career offender designation). In such circumstances, "[w]e are entitled to excuse a defendant's waiver in the district court if the government fails to properly and timely raise a waiver contention in its brief." *United States v. Palomino-Coronado*, 805 F.3d 127, 130 n.3 (4th Cir. 2015) (citations omitted).

*Miranda* waiver and answer questions, Giddins would not have had his car returned to him. As such, it was unduly coercive.

2.

Giddins next argues that the officers engaged in unfair coercion by lying to him about whether or not he was in trouble during the course of the interview. The government submits that Det. Taylor never lied to him, but merely omitted the full story. We think the government draws too fine a line between what is permitted and what is not, and we agree with Giddins that Det. Taylor's actions were improper.

"Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (citations omitted). Indeed, there is "no duty to advise [a defendant] of the identity of the specific offense under investigation." *Braxton*, 112 F.3d at 784 (citations omitted).

However, as our sister circuits have acknowledged, "failure to inform [a] defendant that he was the subject of the investigation . . . [when the] defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead" results in affirmative deceit. *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir. 1983) (citations omitted); *see also United States v. Erekson*, 70 F.3d 1153, 1158 (10th Cir. 1995) (relying on *Serlin* and finding that the officer "truthfully responded to [the defendant's] inquiry into the nature of the investigation" and the defendant "did not become a focus of the investigation until two months after the interview"); *United States v. Mitchell*, 966 F.2d

20

92, 100 (2d Cir. 1992) (relying on *Serlin* and finding the EPA agents in question did not mislead about the criminal nature of the investigation); *cf. United States v. Olmstead*, 698 F.2d 224, 226–27 (4th Cir. 1983) (finding no misstatement when the officer "refused to give assurances that [the defendant] would not become a target [of the investigation] in the future"). In order to prevail on such a claim, the "[d]efendant must . . . prove that the misinformation was material in his decision to speak with the [police]," and "produce clear and convincing evidence that the [police] affirmatively misl[ed] him as to the true nature of their investigation." *Serlin*, 707 F.2d at 956 (citations omitted).

Giddins inquired twice whether he was in trouble—first to Det. Morano while Det. Morano was taking notes, and later to Det. Taylor when Giddins was presented with the *Miranda* waiver. Det. Morano responded, "No, you're here getting your car, right?" Video at 10:20:58. Det. Taylor told him, "Not at this point, no." Video at 10:31:10. The government argues that these responses by the officers were truthful.[8] The government further suggests that "[h]ad Giddins asked if the police were planning to arrest him, the officer would have been obliged to answer yes." Appellee's Br. at 20. The government urges us to reach this conclusion on the basis that Giddins had not been formally arrested

---

[8] The government's brief does not actually address the specifics of Det. Morano's response to Giddins and focuses almost exclusively on Det. Taylor's response. *See* Appellee's Br. at 19–20. However, because the government's argument on this point essentially turns on the definition of "trouble" and refers to the conduct of the "officers," we will read the government's brief to argue that Det. Morano's response was also truthful. If the government intended to make a different argument as to Det. Morano, any such argument is waived.

21

at the time Giddins inquired as to whether he was in trouble. This stretches the definition of "trouble" too far, and too narrowly distinguishes the case law.

At the time Det. Taylor entered the room, he had an arrest warrant in hand for Giddins. More to the point, Det. Taylor was the affiant on that warrant. And as acknowledged by the government, there is no evidence in the record to suggest that Det. Taylor was not going to execute that arrest warrant during his interview with Giddins. *See* Oral Argument at 21:27, 23:18, *United States v. Giddins*, No. 15-4039, (4th Cir. argued Jan. 25, 2017), http://coop.ca4.uscourts.gov/OAarchive/mp3/15-4039-20170125.mp3.

We have no doubt that Giddins was "in trouble" when he asked both Det. Morano and Det. Taylor whether he was. The fact that an arrest warrant existed for Giddins and that Det. Taylor knew about and possessed the warrant meant that Giddins was, in fact, "in trouble" from the moment he walked into the police station. And the government has not produced evidence sufficient to carry its burden that would suggest that Det. Morano was not aware of the warrant. Once an arrest warrant issues, there is no question that the person named in that arrest warrant is "in trouble." Therefore, there can be no question that Det. Morano and Det. Taylor affirmatively misled Giddins as to the true nature of the investigation by failing to inform him that he was the subject of the investigation. This form of deceit thus constitutes coercion.

3.

It is not enough, however, to simply find coercion. As mentioned above, the coercion must rise to a level such that "the defendant's will has been overborne or his

22

capacity for self-determination critically impaired." *Braxton*, 112 F.3d at 780 (internal quotation marks and citations omitted). "We conduct this review by considering 'the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.'" *Holmes*, 670 F.3d at 592 (quoting *Braxton*, 112 F.3d at 781)).

We concluded in Section III.B.1, *supra*, that Giddins was in custody, although not subject to formal arrest at the time of the interview. Further, the interview took place in a police station under false pretenses that Giddins was required to submit to questioning in order to have his vehicle returned to him, and that he was not "in trouble." Although the interview was of short duration, the setting and details of the interrogation give us grave concerns.

The government argues that Giddins was not new to the criminal justice system, having garnered a number of previous convictions,[9] and that he therefore knew about *Miranda*, his rights, and how to invoke his Fifth Amendment right to silence and right to counsel. Giddins's background and experience is relevant to the totality of the circumstances, but the test is precisely that—one of totality. And evaluating the entirety of the interview and the conditions under which Giddins was encouraged to waive his rights

---

[9] The government argues specifically that Giddins "had completed a federal sentence for arson and at the time of his sentencing for the instant bank robbery, had a criminal history category of IV even before application of the career offender enhancement." Appellee's Br. at 22 (citations omitted). Although this information was not before the district court at the time of the suppression hearing, we may consider it in deciding whether to affirm the court's pre-trial denial of a motion to suppress. *United States v. Gray*, 491 F.3d 138, 148 (4th Cir. 2007).

23

under the Fifth Amendment pursuant to *Miranda*, we believe the police coercion was sufficient to rise to the level such that Giddins's will was overborne or his capacity for self-determination critically impaired.

Accordingly, we conclude that Giddins's *Miranda* waiver and statements were involuntary and the result of police coercion.

C.

Having found Giddins's statements to the police involuntary, we evaluate the conviction for harmless error as a constitutional trial error. *Fulminante*, 499 U.S. at 295, 308. "In assessing whether a constitutional error was harmless, we determine whether the admission of the statement as issue 'was harmless beyond a reasonable doubt, such that it is clear that a rational fact finder would have found the defendant guilty absent the error.'" *United States v. Watson*, 703 F.3d 684, 698 (4th Cir. 2013) (quoting *United States v. Poole*, 640 F.3d 114, 119–20 (4th Cir. 2011)) (alterations omitted). "The test . . . is not whether laying aside the erroneously admitted evidence there was other evidence sufficient to convict beyond a reasonable doubt . . . , but, more stringently, 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Thompson v. Leeke*, 756 F.2d 314, 316 (4th Cir. 1985) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87 (1963)).

The Court in *Fulminante* identified three considerations in finding whether admission of statements given by a defendant in violation of the Fifth Amendment would survive harmless error: (1) the importance of the statement to the government's case; (2)

24

the impact on credibility of other evidence; and (3) the admission of prejudicial evidence based solely on the admission of the statement. *See* 499 U.S. at 297–300. We review the record de novo to determine "whether the [government] has met its burden of demonstrating that the admission of the [statements] did not contribute to [the defendant's] conviction." *Id.* at 295–96 (citing *Chapman v. California*, 386 U.S. 18, 26 (1967)).[10]

The government has failed to meet its burden here, arguing the incorrect test and merely citing to the other evidence in the case as overwhelming.[11] In *Thompson*, we made explicit that even when the other evidence introduced in the case was sufficient to convict beyond a reasonable doubt, we impose a higher burden and a concomitantly more exacting test to determine whether a constitutional error was harmless. *See Thompson*, 756 F.2d at 316 (noting that if the test were simply looking to the other evidence, that test would "undoubtedly be met," but affirming reversal of conviction under the stricter standard derived from *Chapman*); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 81 n.7

---

[10] The Court in *Fulminante* did note a distinction between "statements by a defendant [that] may concern isolated aspects of the crime or may be incriminating only when linked to other evidence" and "a full confession in which the defendant discloses the motive for and means of the crime [that] may tempt the jury to rely upon that evidence alone in reaching its decision." 499 U.S. at 296. Falling within the former category, however, does not mean the defendant is entitled to a lesser degree of harmless error review, although the Court's opinion suggests that the latter category is less likely to be harmless.

[11] The government's argument consists of one paragraph, which in short says "[a]ssuming arguendo that either Giddins's statement or his *Miranda* waiver had been involuntary, he suffered no prejudice from the introduction of the video recording of his questioning. The government had abundant evidence of Giddins's guilt even without the admission of his statements." Appellee's Br. at 24.

25

(2004) ("When the Government has the burden of addressing prejudice, as in excusing preserved error as harmless on direct review of the criminal conviction, it is not enough to negate an effect on the outcome of the case." (citing *Chapman*, 386 U.S. at 24)).[12]

Even assuming the government had tried to meet its burden, it cannot here. Looking to the record, the government previewed Giddins's statements to the police in its opening statement, telling the jury that Giddins lied to the police about his whereabouts during the September 25th robbery—the only robbery in which he was an active participant—which damaged Giddins's credibility before the jury. J.A. 131–32. Also on the first day of trial, during Det. Taylor's testimony, the video was played by the government, and Det. Taylor was asked to narrate and describe what was happening. J.A. 194–97. On the second day of trial, the government called two witnesses to refute Giddins's alibi for September 25th—the general manager of the restaurant where Giddins worked, and Giddins's parole officer. J.A. 245–55.

During closing arguments, the government relied on Giddins's repeated use of his phone in the videotape, as well as Giddins's statement that he had been reprimanded at work for using his phone to prove that Giddins's cell phone was always with him in order to corroborate the cell site location information and refute any contention that the phone

---

[12] To the extent the government contends that the standard from *Thompson* is no longer applicable, we note that the holding in *Fulminante* did not call into question the holding of *Thompson*, nor has any subsequent en banc opinion of this court. *See United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005) ("A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court." (quoting *Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090 (4th Cir. 1993))).

did not accurately represent Giddins's location at a given time.  J.A. 615–16.  Finally, at the end of the closing, the government emphasized that "Mr. Giddins lied" when he provided an alibi to the police, and reminded the jury of the witnesses who came in to refute the alibi.  J.A. 622–23.  The government specifically told the jury, "The Defendant lied to create an alibi for the day of the robbery so that he wouldn't be caught, and he hoped that no one would be able to prove him wrong."  J.A. 623.

As the Fifth Circuit has recognized, where "the government's closing argument relied on the very evidence that offends [a constitutional right], we cannot see how the government can conclusively show that the tainted evidence did not contribute to the conviction."  *United States v. Jackson*, 636 F.3d 687, 697 (5th Cir. 2011) (internal quotation marks and alterations omitted).  We largely agree, although we stop short of adopting such a conclusive rule.  Although Giddins's statements were not the focal point of the government's closing argument, the statements and evidence brought in to refute his alibi were essential links in the chain of evidence presented to the jury that the government argued led to conviction.  On this set of circumstances, we cannot see a way for the government to prove *beyond a reasonable doubt* that the inadmissible statements did not contribute to the conviction.  Therefore, we find this error not harmless, and reverse the conviction.

IV.

For the foregoing reasons, we conclude that Giddins's waiver of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1965), was involuntary, and that his post-waiver

27

statements were therefore inadmissible.  We further conclude that the error in introducing those statements was not harmless.  Therefore, the judgment of conviction is

*REVERSED*.

AGEE, Circuit Judge, dissenting:

The majority holds that the district court erred by allowing the Government to introduce videotaped statements that Giddins made to police because they occurred during the course of a custodial interrogation after an involuntary *Miranda* waiver. Because I conclude that the majority misapplies the relevant case law and fails to adhere to the record, I respectfully dissent.

I.

The majority first errs by determining that Giddins was "in custody" and, therefore, that *Miranda* warnings were necessary before the officers could question him. *Miranda* warnings are only required in "custodial interrogations."[1] *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). "Custody under *Miranda* attaches where there is a 'formal arrest' or a 'restraint on freedom of movement' akin to formal arrest. This standard is 'objective'" and examines the totality of the circumstances. *J.D.B. v. North Carolina*, 564 U.S. 261, 286 (2011) (internal citation omitted). To determine whether an interrogation is "custodial," courts ask whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). But in making that determination, courts must not overlook that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the

---

[1] It is undisputed that Giddins was "interrogated."

29

suspect to be charged with a crime," and that is not enough to render the interrogation "custodial." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

Here, the circumstances show that a reasonable person would have understood that he could choose not to answer the detectives' questions and leave. Consequently, a reasonable person would have concluded that he was not in custody.

It is important to remember how the interrogation came about: Giddins went to the police station of his own volition because he wanted to retrieve his vehicle, which the police had impounded because it had been used in several bank robberies. Giddins, not the police, initiated the contact because he wanted something from them. From the outset, then, a reasonable person would understand that because he was at liberty to come to the police station for his own purposes, he was equally at liberty to leave. *See, e.g.*, *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985) (observing the "total absence of any coercion occasioned by the police" where a suspect voluntarily responded to a note left by the police requesting to speak with the suspect and the suspect waited two days before showing up at the station).

Nevertheless, Giddins contends—and the majority agrees—that he was not free to leave because the police told him they needed to ask him a few questions before he could leave with his vehicle. The district court concluded that this argument conflated the issue of whether Giddins could leave with his car with whether he could end the interview and simply leave the police station. J.A. 79–80. Without elaboration or citation to authority, the majority rejects that conclusion as a "distinction without a difference." Majority Op. 14. To the contrary, that distinction properly centers the analysis on the constitutional

30

inquiry: whether the interviewee can decline to answer questions and walk away from the encounter with the police. *See Florida v. Bostick*, 501 U.S. 429, 435–36 (1991). But there was nothing about Giddins' mission to inquire about his vehicle that would have affected his perception of the freedom to leave the presence of the police without answering questions about another topic. A reasonable person would have understood from the nature of this interaction that Giddins was able to terminate the questioning had he so desired.[2]

That conclusion remains true even though, as it turned out and unknown to Giddins, the police officers also wanted to talk to him. In fact, his co-conspirators had implicated Giddins in the bank robberies and the police had already shown probable cause to obtain an arrest warrant for him. But law enforcement officers' subjective knowledge and motive do not, on their own, mean that Giddins was in custody. Rather, it is "the compulsive aspect of custodial interrogation, *and not the strength or content of the government's suspicions at the time the questioning was conducted* that implicates *Miranda*." *United States v. Uzenski*, 434 F.3d 690, 704 (4th Cir. 2006) (emphasis added); *accord J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011) (stating "the subjective views harbored by . . . the interrogating officers . . . are irrelevant" to determining whether a person is in custody (internal quotation marks omitted)). So what the detectives knew and what their motives

---

[2] For the reasons discussed in the voluntariness section below, *infra* II.A, any influence the police had because of the impounded car does not rise to a level that would implicate Giddins' Fifth Amendment rights. *See United States v. Jamison*, 509 F.3d 623, 628–30 (4th Cir. 2007) (cautioning that "factors independent of police restraint," *i.e.*, those "separate [from] the restrictions on his freedom arising from the police interrogation [as opposed to] those incident to [a suspect's] background circumstances," do not cause the encounter to be custodial).

were in speaking to Giddins are not relevant to the *Miranda* analysis.

In addition to Giddins' voluntary appearance at the police station to discuss the return of his vehicle, no other aspect of the encounter would have caused a reasonable person to conclude he was not free to leave. As the district court found: "Giddins was not in handcuffs, and one door was unlocked. . . . No weapons are visible[.] Detective Taylor's tone was nonthreatening." J.A. 79. *See, e.g.*, *United States v. Hargrove*, 625 F.3d 170, 179–80 (4th Cir. 2010) (counting amongst the totality of circumstances that the defendant "was not handcuffed at the time of the interview, the agents did not draw their weapons . . ., and the conversation was amicable and non-threatening in tone"); *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (same). In addition, Giddins was told he was not under arrest and could leave.[3] Under these circumstances, a reasonable person would have believed that he could end the interrogation of his own accord.

The majority points to additional facts that have limited relevance to the pertinent inquiry in an attempt to transform Giddins' questioning into a custodial interrogation. For example, it points out that the open door to the interrogation room was "past the questioning detective" and that Giddins would have had to "walk past" the detective in order to exit

---

[3] While the majority correctly quotes our precedent that "such a statement is not talismanic or sufficient in and of itself to show a lack of custody," Majority Op. 14 (citing *United States v. Hashime*, 734 F.3d 278, 284 (4th Cir. 2013)), the majority errs because it gives that factor no weight. It is one of the circumstances properly considered as part of the totality. *E.g.*, *United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) ("[T]he officer's statement [that the suspect is not under arrest] was only one of several factors in our calculus of determining custody—not a dispositive factor[.]); *Davis*, 778 F.2d at 171–72 ("[I]nforming a suspect that he is not under arrest is one factor frequently considered to show a lack of custody[.]").

through it. Majority Op. 13–14. Though our precedent acknowledges that an officer's position in a room relative to a suspect may be relevant to the custody determination when additional circumstances are present, it also holds that an officer's "mere presence" between the suspect and an exit is not enough to transform the encounter into a custodial one. *See Hargrove*, 625 F.3d at 181 (rejecting the defendant's argument that a law enforcement officer was "blocking" the exit because "no evidence suggests that [the agent] was doing anything other than standing in the doorway" and the record did not indicate the agent "ever prevented [the defendant] from exiting, or that she threatened or coerced [the defendant] to remain in the kitchen" and concluding that "mere presence in the doorway of the kitchen was not sufficient to demonstrate that the agents restrained [the defendant's] freedom of movement in a manner consistent with being in custody"). Here, nothing suggests Detective Taylor physically curtailed or impeded Giddins' freedom of movement at any point or that anything beyond his "mere presence" causes the majority to find this factor significant.

Moreover, by affording weight to this factor, the majority comes dangerously close to equating *every* interview in a police station as per se "custodial." That course clearly contradicts precedent. *See, e.g.*, *California v. Beheler*, 463 U.S. 1121, 1125 (1983) ("[W]e have explicitly recognized that *Miranda* warnings are not required simply because the questioning takes place in the station house[.]" (internal quotation marks omitted)); *see also United States v. Jones*, 818 F.2d 1119, 1123 (4th Cir. 1987) ("The locale in which the interrogation takes place" "is not significant to the inquiry."); *Davis*, 778 F.2d at 171 ("Custody does not result merely because an individual is questioned in a 'coercive

33

environment[.]"). In short, there's no reason from the record to afford any greater weight to the individuals' positions relative to the open door than to the fact that they are in a police station in the first instance. The respective positions of Giddins and the detectives says nothing on its own about whether an individual was free to leave and, thus, cannot transform an otherwise non-custodial questioning into custodial questioning.

The majority also observes that Detective Taylor twice moved Giddins' phone away from him during the questioning as relevant to a custody inquiry. *See* Majority Op. 14. But the majority's focus on Giddins' ability to consult his phone masks the real inquiry. The salient issue is not whether the police momentarily moved Giddins' phone or asked him to turn it off, but whether a reasonable person would have believed he could stop answering questions and terminate the interview. Here, Giddins asked if he could use his phone, and Detective Taylor said "yes," but then mentioned that they would put their cell phones aside on the table in a moment. Video at 10:27:00–10:27:10.[4] That Detective Taylor later implemented that plan by having Giddins place his phone within sight and arm's reach on the table where the men were sitting does not mean he simultaneously curtailed Giddins' "freedom of action . . . to a degree associated with formal arrest." *Cf. Berkemer*, 468 U.S. at 440. In fact, the video shows that Giddins was also repeatedly allowed to consult his phone, respond to calls, and otherwise hold onto his phone during various portions of the questioning. And even though he was asked not to do so at other

---

[4] I adhere to the majority opinion's approach of citing to the time stamp for the video exhibit. *Cf.* Majority Op. 4 n.1.

34

points, that does not rise to the level of restraint necessary to transform the encounter into a custodial interrogation.

For all these reasons, I conclude that Giddins was not "in custody" for *Miranda* purposes. That conclusion does not end the inquiry, though, because even when *Miranda* warnings are not required, the Government cannot introduce at trial statements procured in violation of the Due Process Clause of the Fifth Amendment. *See, e.g.*, *United States v. Cristobal*, 293 F.3d 134, 139–40 (4th Cir. 2002); *Hutto v. Russo*, 429 U.S. 38, 40 (1976).

## II.

The same inquiry that informs whether a *Miranda* waiver was voluntary also informs whether statements were voluntary under the Due Process Clause. *Cristobal*, 293 F.3d at 140 (citing *Colorado v. Connelly*, 479 U.S. 157, 169 (1986) ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context.")). And, regardless of whether the police had to give Giddins his *Miranda* warnings before questioning, the fact remains that the detectives *did* so here. For that reason, the inquiry turns on whether the decision to relinquish certain rights was voluntary, that is to say, whether it was "the product of free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). An individual must understand "both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In other words, a preponderance of the evidence must show that the waiver was

"knowing and voluntary." *United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005).[5]

The voluntariness of a waiver looks to "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2015). "Coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary.'" While "severe physical abuse" and threats at gunpoint satisfy this requirement, less egregious behavior may as well. *See Cristobal*, 293 F.3d at 140.

A.

The majority concludes that Giddins only signed the *Miranda* waiver because the police "engaged in economic coercion" akin to what occurred in *Garrity v. New Jersey*, 385 U.S. 493 (1967), and *Lefkowitz v. Cunningham*, 431 U.S. 801 (1977), by forcing him to choose between talking to the police and not obtaining his vehicle that day. Majority Op. 16–19. Not so. First, the facts of this case fundamentally differ from those in *Garrity* and *Lefkowitz*; second, the majority's conclusion inappropriately rests on purported facts and suppositions that Giddins never raised and that are not in the record.

In *Lefkowitz*, the Supreme Court held unconstitutional a state statute that forced political party officers to testify in certain proceedings (i.e., "waive [their] constitutional privilege against compelled self-incrimination") or be removed from office and barred for five years from holding other party or public offices. 431 U.S. at 802. Similarly, in

---

[5] Giddins does not argue that his waiver was made unknowingly, as the *Miranda* waiver set out his constitutional rights.

*Garrity*, the Supreme Court held unconstitutional a state statute that required public officials and employees to choose between waiving their right not to testify against themselves in criminal proceedings or face termination of employment as well as forfeiture of vested tenure or pensions and eligibility to hold any public office or employment. 385 U.S. at 495. In each case, the Court held that the statutes forced the employees to choose between "self-incrimination or job forfeiture" and thus did not offer any choice at all. *Garrity*, 385 U.S. at 496; *see also Lefkowitz*, 431 U.S. at 807; *Aguilera v. Baca*, 510 F.3d 1161, 1171 (9th Cir. 2007) (describing these cases as establishing "that public employees cannot be compelled to choose between providing unprotected incriminating testimony or losing their jobs"). As such, the statements at issue were involuntary rather than the product of free will, and they could not be used against the individuals in subsequent criminal proceedings. *Lefkowitz*, 431 U.S. at 805–09; *Garrity*, 385 U.S. at. 496–500.

*Lefkowitz* and *Garrity* are inapposite here for at least two reasons. First, neither case directly considered the effectiveness of a *Miranda* waiver. Second, each case considered a statute that required an individual to make a direct choice between waiving his right against self-incrimination, on the one hand, and knowing he would be removed from a particular livelihood (party office, in *Lefkowitz*, and public office, position, or employment, in *Garrity*), on the other. There's simply no comparison between the consequences in those cases and Giddins' situation.

To overcome this false equivalency, the majority attempts to elevate the potential economic impact of any delay in recovering one's vehicle to the certain and incomparable effect of losing one's livelihood. The majority then compounds its error by asserting

37

"facts" that are simply not in the record. *See, e.g.*, Fed. R. App. Pro. 10(a); *United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000) ("This court will not consider material outside the record before the district court."); *Fassett v. Delta Kappa Epsilon*, 807 F.2d 1150, 1165 (3d Cir. 1986) ("The only proper function of a court of appeals is to review the decision below on the basis of the record that was before the district court."). For example, it represents that "Giddins relied on his car to get him to his job, and it was the means of maintaining his livelihood. The threatened economic consequences for him were just as great as the threatened consequences to the [public employees] in *Garrity* and the political party official in [*Lefkowitz*]." Majority Op. 19. But Giddins never made that argument to the district court. Nor did he put forward any evidence that he relied on his car for a job.[6] Hence, the majority creates an argument that was not preserved for appeal and which should have been reviewed only for plain error. *See, e.g.*, *United States v. Bennett*, 698 F.3d 194, 200 (4th Cir. 2012) (describing the plain error standard of review the court applies to arguments a party has not preserved by raising during the criminal proceeding in district court). Here, there was no error, much less plain error.

Denying Giddins access to his car for an undetermined time simply has no correlation to the compulsive effect that animated the Supreme Court's conclusions in

---

[6] To be sure, Giddins asserted in passing that the police used his "interest in getting his car returned as leverage" for talking to them. J.A. 53. But neither his motion to suppress nor his memorandum in reply connect his immediate possession of the vehicle to his ability to maintain employment or any other heightened consequences.

*Lefkowitz* and *Cunningham*.[7] As discussed below, given that the quality and degree of the challenged police conduct determines whether it crosses the line into coercion, this fundamental difference matters.

B.

The majority also concludes that the detectives "affirmatively misled Giddins as to the true nature of the investigation by failing to inform him that he was the subject of the investigation." Majority Op. 22. In particular, they label as "improper" the responses when Giddins asked the detectives if he was in trouble. When asked, Detective Morano replied, "No, you're here getting your car, right?" And when Giddins later asked Detective Taylor the same question, Detective Taylor replied, "Not at this point, no." *Cf.* Majority Op. 20–21. The majority's myopic focus fails to relay the entirety of these exchanges, which taints their constitutional analysis.

Looking to the complete record, Giddins asked Detective Morano if he was in trouble because Morano was taking notes, as evidenced by the interview video and Morano's fuller statement: "No, you're here getting your car, right? No, I've got to take notes for my report. I mean, you understand that the car was used in a crime, right?" *Cf.* Video 10:20:43–10:21:11. The exchange with Detective Taylor was even more

---

[7] There's nothing in the record about the monetary value of Giddins' Ford Focus or even whether it was his only means of transportation. The record is also silent as to what the normal Baltimore County police procedure is for returning property that has been used in a crime. On appeal, Giddins asserts—without any authority—that he would have had to abandon his property interest in the vehicle permanently. There's no indication in the record that the police had or implied that they had such Draconian authority.

comprehensive:

Taylor: . . . [Y]our car was used in crimes, we need to dig in and find out what's going on with your, with these three girls, what your relationship with them is, how they came in contact with your car, all that stuff. Understand that?

Giddins: Yes, I understand that. What I'm asking—

Taylor: OK. . . . . Do you mind explaining that stuff to us?

Giddins: I don't know any of that stuff.

Taylor: Well we don't know that until I ask you, right?

Giddins: Right, but I just told you. That's what I'm asking, like. Is this, like, the procedure to get my car back?

Taylor: Yes, in order for us to ask you questions because the vehicle was used in a crime, by law, we have to go over these rights.

Giddins: Right.

Taylor: If we start asking you stuff and you don't want to talk to us, then don't talk to us.

Giddins: OK.

Taylor: But we're just trying to figure out some issues.

Giddins: But I can still get my car?

Taylor: There is, before I release the car to you, I would like to know some

40

answers.

Giddins: That's what I'm asking.  That's what I'm asking.

Taylor:  I would like to know some answers before we release your car back.

Giddins:  That's what I'm asking.  Yea, that's all.

Taylor:  We'll explain everything to you.

Giddins:  OK, I'm not in trouble or anything, am I?

Taylor:  Not at this point, no.  We'll find out what's going on.  So long as you don't have, you know, sit there and tell me you were hiding in the trunk and you escaped when the police pulled them over, no.

Giddins:  Hiding in the trunk—

Taylor:  You weren't hiding in the trunk were you?

Giddins:  I was at work.

Taylor:  OK, then what do you have to worry about?

Video at 10:30:08–10:31:24.

Viewing the exchanges in context focuses the character of the isolated statements the majority relies on and shows that the totality of the detectives' responses did not improperly compel or coerce Giddins to speak with them.  *See Perkins*, 496 U.S. at 297 (observing police officers are allowed to "mislead a suspect or lull him into a false sense

41

of security [so long as the conduct] do[es] not rise to the level of compulsion or coercion" that violates *Miranda*). The majority elides the context in which the detectives told Giddins he was not "in trouble." The entirety of the exchange negates any concern that Giddins was misinformed about the nature of the questions he would be asked or the potential that he would be deemed a suspect. The totality of the exchanges signaled—truthfully—that they wanted to discuss how Giddins' vehicle came to be used in a bank robbery. Moreover, Detective Taylor expressly told Giddins—again, truthfully—that Giddins did not have to answer any questions he didn't want to. In addition, his momentary reassurance that Giddins was not "in trouble," was immediately caveated by words plainly informing Giddins that if Giddins *were* involved in the robbery, then his position would be different.

What's more, the Supreme Court has never considered whether an affirmative representation about the scope of an interrogation would render a *Miranda* waiver involuntary. *Colorado v. Spring*, 479 U.S. 564, 577 n.8 (1987) (expressly reserving that issue). But that Court has held that "a valid waiver does not require that an individual be informed of all information useful in making his decision or all information that might affect his decision to [talk to the police]." *Id.* at 576. What's more, the Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.* at 576–77. Similarly, this Court has previously recognized that equivocal statements suggesting that a suspect may not be charged, absent a more definite promise to that effect, do not "critically impair" an individual's "'capacity for self-determination'" or otherwise

42

cause their will to be "'overborne in such a way as to render his confession the product of coercion.'" *United States v. Byers*, 649 F.3d 197, 216 (4th Cir. 2011) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991)). More to the point, this Court also has held, "misrepresentations are insufficient, in and of themselves, to render a confession involuntary." *United States v. Whitfield*, 695 F.3d 288, 302 (4th Cir. 2012).

All this is to say, even if part of the detectives' responses suggested Giddins was not in trouble, that's not enough to create a constitutional problem. Here, the detectives' combination of truthful statements and passing reassurances did not rise to the level of deceptiveness that implicated Giddins' due process rights. *See United States v. Holmes*, 670 F.3d 586, 592–93 (4th Cir. 2012) (recognizing "that situations that make an individual "uncomfortable or create a predicament for a defendant are not ipso facto coercive" (internal quotation marks omitted)).

## C.

Even assuming that the majority is correct that either maintaining possession of Giddins' vehicle or reassuring Giddins gave rise to concerns about coercion, those acts still did not violate Giddins' due process rights because the totality of the circumstances demonstrate that they did not render his *Miranda* waiver involuntary. To be sure, Giddins faced a choice, but it remained a voluntary choice so long as the detectives did not cause his "will [to] have been overborne and his capacity for self-determination critically impaired." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) ("[T]he mere existence of . . . implied

43

promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary.").

Based on the full record, I conclude that Giddins voluntarily answered the detectives' questions. Giddins was not in custody, but rather came voluntarily to the police station desiring to recover his vehicle. He then learned that the police intended to question him about how that vehicle came to be used in a bank robbery, including his relationship with the women who had been arrested. Unlike many subjects of interrogation whose statements are nonetheless deemed voluntary, Giddins knew—and, indeed, anticipated—the true subject matter of the interview. And although the detectives did not tell Giddins he was a suspect or that they had an arrest warrant for his arrest, nothing required them to alert Giddins to either fact as part of his decision-making process. *See Connelly*, 479 U.S. at 176–77. The conversation remained civil and conversational, with both detectives maintaining a cordial, non-threatening demeanor throughout the exchange. In addition, Giddins had a criminal record, making him familiar with *Miranda* and his constitutional rights even before Detective Taylor presented him with the *Miranda* waiver. *See United States v. McClinton*, 982 F.2d 278, 283 (8th Cir. 1992) (observing that a defendant's criminal record demonstrated familiarity with the criminal justice system, which decreased his susceptibility to pressure and, thus, his likelihood to make an involuntary statement to police). Lastly, Giddins points to no other impairment that would have affected his decision-making capacity that day.

44

In sum, nothing about the setting, the detectives' statements, or Giddins' background suggests that his will was overborne or that his capacity for self-determination was substantially impaired at the time he signed the *Miranda* waiver and decided to continue talking to police. Instead, the record shows that Giddins made an "essentially free and unconstrained choice" to waive his rights and speak with the detectives. *See Abu Ali*, 528 F.3d at 234; *see also Connelly*, 479 U.S. at 170 ("The voluntariness of a waiver . . . has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word."). Accordingly, the waiver was effective and no due process violation occurred. *See Holmes*, 670 F.3d at 591.

\* \* \* \*

For all these reasons, I conclude the majority fails to assess correctly the relevant analysis for when an individual's voluntary statements to law enforcement can be used against him at trial. Therefore, I respectfully dissent and would affirm the judgment of the district court.[8]

---

[8] Because I conclude that no constitutional error occurred, let alone reversible error, affecting Giddins' conviction, I would ordinarily need to address the sentencing issue Giddins raised on appeal. That issue challenged the district court's decision to sentence him as a career offender under U.S.S.G. § 4B1.1. Both Giddins and the Government assumed that U.S.S.G. § 4B1.2's definition of a crime of violence would be modified by *Johnson v. United States*, 135 S. Ct. 2551 (2015), such that the Guidelines' residual clause would be declared unconstitutional. After briefing, the Supreme Court issued its decision in *Beckles v. United States*, 137 S. Ct. 886 (2017), which held that "the advisory [Sentencing] Guidelines are not subject to vagueness challenges under the Due Process Clause," so the residual clause of § 4B1.2(a)(2) remains constitutional. *Id.* at 890. *Beckles* thus forecloses Giddins' argument on this issue.

Lastly, Giddins argues—for the sake of preservation only—that the district court erred by denying his motion to suppress cell site location information obtained from his cell phone. I agree with footnote 5 of the majority's opinion noting that Giddins has preserved the issue, but that our en banc decision in *United States v. Graham*, 824 F.3d 421 (4th Cir. 2016), forecloses that argument.